709 F.2d 1138
 113 L.R.R.M. (BNA) 3087, 97 Lab.Cas. P 10,193,
8 Collier Bankr.Cas.2d 921, 10 Bankr.Ct.Dec. 1160,
Bankr. L. Rep. P 69,300
 Nathan YORKE, Trustee in Bankruptcy, the Seeburg
Corporation, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
Warehouse, Mail Order, Office, Professional and Technical
Employees Union, Local 743, International
Brotherhood of Teamsters, Chauffeurs,
Warehousemen and Helpers of
America, Intervenor.
 No. 82-1334.
 United States Court of Appeals,
Seventh Circuit.
 Argued Dec. 1, 1982.
Decided June 1, 1983.
Rehearing and Rehearing En Banc Denied Aug. 26, 1983.
 
 Malcolm M. Gaynor, Schwartz, Cooper, Klob & Gaynor, Chicago, Ill., for petitioner.
 Corinna L. Metcalf and Elliott Moore, Washington, D.C., for respondent N.L.R.B.
 Stephen B. Rubin, Chicago, Ill., for intervenor.
 Before CUDAHY, COFFEY and TIMBERS*, Circuit Judges.
 TIMBERS, Circuit Judge.
 
 
 1
 Nathan Yorke, Trustee in Bankruptcy of the Seeburg Corporation (Company),[1] petitions for review of an order of the National Labor Relations Board, 259 N.L.R.B. 819 (1981), finding that the Trustee violated Secs. 8(a)(5) and 8(a)(1) of the National Labor Relations Act (Act), 29 U.S.C. Secs. 158(a)(5), 158(a)(1) (1976), by failing to bargain over the effects of his decision to close the Company's plant in Chicago. The Board has filed a cross-application to enforce its order.
 
 
 2
 Without giving Local 743, International Brotherhood of Teamsters (Union), prior notice or affording it a subsequent opportunity to bargain, the Trustee terminated operations and discharged the seven remaining employees who were Union members. The Board determined that a bargaining order by itself would not remedy the unfair labor practice since the plant closure had decimated the Union's bargaining strength. Accordingly, to restore the Union's position, the Board ordered a limited backpay remedy, requiring the Trustee to pay wages to the seven employees for a period beginning five days after the date of the Board's decision until (1) the parties reached an agreement, or (2) the parties reached an impasse, or (3) the Union failed to request bargaining within five days after the decision, or (4) the Union failed to bargain in good faith. While the backpay requirement was conditioned on the number of days elapsing before the parties reached impasse or an agreement, the Board imposed a minimum two week backpay period to discourage artificially quick impasse.
 
 
 3
 Although we are not in complete accord with the Board's reasoning, we conclude that substantial evidence supports the Board's findings of violations of Secs. 8(a)(5) and 8(a)(1). We enforce the Board's remedial order with the condition specified herein.
 
 I.
 
 4
 The Company, a Delaware Corporation, was engaged in the manufacture of juke boxes and other machinery at its facility in Chicago. In November 1977, it entered into a three-year collective bargaining agreement with the Union with respect to a unit of "all plant clerical, and all production and maintenance employees of the Company". As of July 1979, Seeburg employed approximately 385 employees. Shortly thereafter, the Company experienced severe financial reversals. It began laying off employees. The Union did not challenge the propriety of the layoffs.
 
 
 5
 On November 1, 1979, the Company filed a petition for reorganization under Chapter 11 of the Bankruptcy Code, 11 U.S.C. Secs. 1101-1174 (Supp.III 1979). At the time, the Company still employed 150 members of the bargaining unit. The Company as debtor-in-possession continued its operations on a diminishing basis. It continually reduced its complement of employees, reaching a low of seven in early 1980. Because of allegations of fraud and mismanagement, the bankruptcy court appointed Nathan Yorke as Trustee in Bankruptcy for the debtor company on February 4, 1980. As Trustee, Yorke assumed full control of the Company. His duties primarily were to evaluate Seeburg's assets and formulate a plan of reorganization which would be acceptable to all creditors. 11 U.S.C. Sec. 1106(a) (Supp.III 1979).
 
 
 6
 Yorke first visited the plant on the day of his appointment, February 4. He found no unit employees working in the production area. Seven unit employees, however, remained on the Company payroll. The ALJ credited Yorke's testimony that he did not know that the employees belonged to a union.
 
 
 7
 At the first creditors' meeting on February 8, Yorke learned that the Company owed its employees more than the $5000 it had in the bank and that its $6,000,000 in unliquidated assets (worth approximately $1,500,000 if liquidated) were eclipsed by overall liabilities exceeding $8,000,000. Following the meeting, Yorke decided that it was in the Company's best interest to terminate operations completely. He immediately applied to the bankruptcy court for authorization. The court granted the application on February 11. Yorke closed the plant the next day. Yorke obtained $6000 in funds from Seeburg's cash on hand to pay the employees for the period through February 9. He admittedly did not notify the Union of his decision to terminate operations.
 
 
 8
 By a letter dated February 15, the Union, through its attorney Edwin H. Benn, requested bargaining over the effects of the plant closure. In pertinent part, the letter read as follows:[2]
 
 
 9
 "Gentlemen:
 
 
 10
 The undersigned represents Local 743 I.B.T. The Union has a collective bargaining agreement covering the employees of Seeburg Corporation. As you are well aware, this agreement governs the wages, hours and working conditions of those employees.
 
 
 11
 It is apparent to the undersigned that the rights of these employees are being seriously undermined. It has come to our attention that numerous employees whom we represent are being transferred to do work for different companies within your corporate structure and that work, covered by our contract, is being performed elsewhere. It has also come to our attention that the remaining employees of Seeburg Corp. have been locked out as of February 11, 1980....
 
 
 12
 ... This is also to demand that an immediate meeting be set up so that we can discuss the decision and effects that your action has on our bargaining unit employees....
 
 
 13
 ... [W]hat were the reasons that the Seeburg employees were denied the ability to come to work on February 11, 1980. Will they be transferred to other payrolls of either Choice Vend, XCor or any other companies under those companies' control? What has happened to the Seeburg supervisory personnel? Have they been transferred to either Choice Vend, XCor or any companies under those companies' control?
 
 
 14
 Third, are you aware of any prospective purchasers of the Seeburg Corporation? If so, please identify their names and addresses. If a sale or other disposition of the Seeburg Corporation is contemplated, please inform us what will happen to the existing facility, such as the property, fixtures, machinery, trucks, furniture, etc.? In particular, we would desire to know if there will be a sale or transfer to other companies within the XCor Corporation. If there will be an acquisition by another XCor Corporation company, we would like to know the intentions of XCor concerning future employment of the managerial, supervisory, or other nonunion employees who have been working for Seeburg. This would also include any transfer of employees to Choice Vend. Further, we would desire to know what will happen to existing accounts receivable and payable, existing lease agreements or contracts, other existing liabilities as well as good will. We would further desire to know the disposition of any existing commitments to customers or creditors. We are particularly interested in knowing what will be the disposition of work done by Seeburg employees covered by our collective bargaining agreement. Will that work be transferred to any other entity within the XCor Corporation or Choice Vend?
 
 
 15
 Please be advised that we expect our collective bargaining agreement to be abided by and we expect a response to this letter by close of business February 22, 1980. Failure to answer this letter by the time indicated will necessitate the institution of the proper proceeding."Yorke responded to this letter on February 25, stating:
 
 
 16
 "I am in receipt of your letter dated February 15, 1980. Please be advised that the undersigned was appointed Trustee on February 4, 1980. Be further advised that the Trustee discontinued the operation of the business and has no employees.
 
 
 17
 In reply to your questions, Excor is a publicly owned company. Consolidated Entertainment owns all the stock of the Seeburg Corporation. I do not know who owns Choice Vend. I do not know if Choice Vend or Excor have any collective bargaining agreements with labor organizations.
 
 
 18
 If there is any further information you desire, I will be happy to furnish same."
 
 
 19
 The Union interpreted Yorke's letter as a refusal to bargain and consequently filed an unfair labor practice complaint on February 28, alleging that the Trustee had committed various unfair labor practices, including failing to bargain in good faith.[3] No discussions between the Trustee and the Union ensued.
 
 
 20
 In April, Yorke informed the Union that the Company planned to recall several employees to assist in selling parts as authorized by the bankruptcy court. Ultimately, three bargaining unit employees worked at the plant for the next three to four months. The General Counsel filed a complaint in June, alleging that the Trustee's failure to give notice that he was terminating operations and his subsequent failure to bargain over the effects of that decision constituted violations of Secs. 8(a)(5) and 8(a)(1) of the Act.
 
 
 21
 Within the month following the filing of the General Counsel's complaint, the Trustee located a potential purchaser for the remaining assets of the Company. Creditors agreed to the Trustee's plan of liquidation in July. The bankruptcy court approved the plan on July 28. At that time, the court also ruled that the Board's backpay claim on behalf of the employees, pending the unfair labor practice proceeding, was an administrative expense entitled to priority under the Bankruptcy Code. After negotiations between the Board, the Trustee, and the prospective purchaser of the Seeburg assets, the purchaser agreed to set aside $49,000 of assets and $6000 of its own money to cover the backpay claim in the event the Company ultimately should be found liable.
 
 
 22
 Upon concluding the unfair labor practice hearing in February 1981, the ALJ determined that the Trustee had committed the violations as charged. As a consequence, the ALJ recommended issuing a bargaining order. The Board adopted the ALJ's findings but found that a bargaining order by itself was insufficient to remedy the violations. Consequently, the Board imposed a sliding backpay requirement upon the Trustee in accordance with its decision in Transmarine Navigation Corp., 170 N.L.R.B. 389 (1968). This was to strengthen the Union's bargaining position to a point approximating the one the Union enjoyed at the time the Trustee closed the plant.
 
 
 23
 The Trustee petitions to review and set aside the Board's order. The Board has filed a cross-application to enforce its order. The Union as intervenor has filed a brief urging that the Board's order be enforced.
 
 II.
 
 24
 We start with the proposition that a Trustee in Bankruptcy, like any other employer, must abide by the labor laws, as long as they prescribe conduct consistent with the duties imposed by the Bankruptcy Code. Local Joint Executive Board v. Hotel Circle, Inc., 613 F.2d 210, 215 (9th Cir.1980) (duty to bargain continues); Shopmen's Local No. 455 v. Kevin Steel Products, Inc., 519 F.2d 698, 704 (2nd Cir.1975) ("obligation to comply with the Labor Act [continues]; NLRB v. Bachelder, 120 F.2d 574, 576 (7th Cir.) (duty to bargain and honor employees' rights to self-organization), cert. denied, 314 U.S. 647 (1941). Cf. In re Bildisco, 682 F.2d 72, 82-83 (3rd Cir.1982) (while debtor-in-possession may reject collective bargaining agreement as executory contract, "it may be required to recognize and bargain with the union"), cert. granted, 51 U.S.L.W. 3525 (U.S. Jan. 18, 1983) (No. 82-818).
 
 
 25
 The law in question--the duty to bargain over the effects of a decision to terminate operations--strikes us as critical to protect employees from the ravages of economic dislocation. NLRB v. Royal Plating & Publishing Co., 350 F.2d 191, 196 (3rd Cir.1965); NLRB v. Adams Dairy, Inc., 350 F.2d 108, 115 (8th Cir.1965), cert. denied, 382 U.S. 1011 (1966); Burgmeyer Bros., Inc., 254 N.L.R.B. 1027, 1028 (1981). So-called "effects" bargaining provides the Union with an opportunity to bargain in the employees' interest for such benefits as severance pay, payments into the pension fund, preferential hiring if the employer continues operating at other plants, and reference letters with respect to other jobs. First National Maintenance Corp. v. NLRB, 452 U.S. 666, 681-82 (1981). We therefore must determine whether imposing a duty upon the Trustee here to bargain over the effects of a decision to terminate operations is consonant with the Trustee's functions under the Bankruptcy Code.
 
 
 26
 We believe that recognizing a duty to bargain would not unduly impede the Trustee's discharge of his responsibilities. To protect creditors, the Trustee must administer the debtor corporation, 11 U.S.C. Sec. 704(1) (Supp.III 1979), and thereby take responsibility for "the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case." 11 U.S.C. Sec. 503(b)(1)(A) (Supp.III 1979). Since the obligation to bargain arises only with the Trustee's decision to terminate operations in the overall interests of the creditors, the costs concomitant with that decision properly can be attributed to the Trustee's efforts to "preserve the estate" on the creditors' behalf. As the bankruptcy court here determined, therefore, costs stemming from "effects" bargaining can be considered administrative expenses and thus fall within the ambit of the Trustee's authority. Cf. Reading Co. v. Brown, 391 U.S. 471, 482-84 (1968) (those injured during administration of estate by Trustee entitled to priority claim as administrative expense); In re W.T. Grant Co., 620 F.2d 319 (2nd Cir.) (severance payments to employees entitled to priority as administrative expense), cert. denied, 446 U.S. 983 (1980). But cf. In re Mammoth Mart, Inc., 536 F.2d 950, 955 (1st Cir.1976) (claim for severance pay based upon services rendered before bankruptcy not an administrative expense). While the Trustee's discretion might be constrained by his need for authorization from the bankruptcy court, that limitation can be taken into account in any bargaining. With these considerations in mind, we must determine whether the Trustee's failure to bargain in this case violated Secs. 8(a)(5) and 8(a)(1) of the Act.
 
 
 27
 The Board predicated its Sec. 8(a)(5) conclusion on two findings: first, that the Trustee failed to notify the Union of his decision and, second, that he failed to bargain in the aftermath of the closure. While we disagree with the Board's first ground, we are satisfied that the second ground is sufficient to support a conclusion of failure to bargain.
 
 
 28
 The Trustee does not dispute that he failed to notify the Union before shutting down the plant. In essence he pleads extenuating circumstances: that he neither knew of the Union's existence, nor had time in any event to notify or bargain before implementing his decision. Irrespective of whether he knew or should have known of the Union's existence,[4] we agree that the emergency situation with which he was confronted excused his obligation to notify the Union before closure. The bankruptcy court appointed Yorke trustee on February 4 as the result of allegations that the former management had grossly mismanaged the Company's dwindling assets. On the same day, Yorke visited the plant and saw no employees at work. Soon thereafter, he discovered that the Company did not have the funds to meet the payroll and learned of the Company's overall financial straits. Surely, the Trustee's responsibilities dictated immediate action. The Union could not reasonably be expected to benefit from several days notice before the Trustee's decision went into effect. Indeed, previous Board decisions have recognized that an employer has no duty to notify a union prior to closing in an "emergency" situation. Kingwood Mining Co., 210 N.L.R.B. 844, 844-45 (1974) (grave economic crisis precipitated management decision to terminate mining operations and excused notice); National Terminal Baking Corp., 190 N.L.R.B. 465, 466 (1970) (emergency situation precipitated by theft of Company's two delivery trucks which made continuation of the enterprise impractical). We hold that the Board's implicit conclusion that the Trustee was not faced with an emergency is not supported by substantial evidence.
 
 
 29
 The Trustee's failure to bargain after the closure about the effects of his decision stands on a different footing. Once operations had been terminated, the emergency situation ended. Three days after the plant shutdown, the Union addressed a letter to Yorke demanding bargaining about the effects on the employees. The letter informed the Trustee that unless he responded within a week, the Union would press charges. The Trustee's subsequent response was equivocal. Although he ignored the request for bargaining, he concluded the letter with the sentence, "If there is any further information you desire, I will be happy to furnish same." The Board reasonably could conclude that Yorke's evasive response when confronted by the Union's clear demand for bargaining constituted a failure to bargain in good faith. The Trustee's continued failure to submit to bargaining in the weeks following closure--even when he decided to recall several employees--bolsters the Board's conclusion. Therefore, while we have held that prior notice was not necessary, we hold that the Trustee's failure to accede to the Union's request for bargaining violated Secs. 8(a)(5) and 8(a)(1) of the Act.
 
 III.
 
 30
 This brings us to the propriety of the Board's choice of remedy.
 
 
 31
 The Trustee strenuously objects to imposition of the type of limited backpay order formulated in Transmarine Navigation Corp., 170 N.L.R.B. 389 (1968). He argues that the order should be set aside as impermissibly punitive under Sec. 10(c) of the Act, 29 U.S.C. Sec. 160(c) (1976), both because the limited backpay order in general is unjustified in the bankruptcy context and because the minimum two weeks of backpay ordered by the Board exacts too great a cash concession from the Trustee. The Transmarine type order issued by the Board requires the Trustee to pay the seven employees their normal daily wage from five days after the Board's decision until an agreement or impasse over effects bargaining is reached, as long as the total is not less than an amount equivalent to two weeks pay and not greater than an amount the employees would have received had they worked until the time they found alternative employment. Since we believe that the Trustee misconceives the nature of the remedy, we enforce the Board's order.
 
 
 32
 The Trustee first contends that the Transmarine remedy in any form is unwarranted in the bankruptcy context. He argues that once a company is bankrupt, there can be no meaningful bargaining--in other words, if the Company has no assets, it cannot make concessions. Arguably, a union in that situation has no bargaining power because the services of its employee members no longer are required. The Supreme Court in Republic Steel Corp. v. NLRB, 311 U.S. 7, 9-13 (1940), emphasized that, while the Board is given wide leeway in fashioning remedies, the remedy chosen must "achieve the remedial objectives which the Act sets forth," id. at 12, and must not punish the employer for its violations. Under Transmarine, however, the bankrupt employer may be forced to pay more than he would have even if bargaining had taken place and the conditional backpay remedy in those situations would be punitive.
 
 
 33
 The Trustee's argument here, however, that the conditional backpay requirement is unwarranted under all circumstances is belied by the facts of this case. Although the Company was bankrupt, at the time of closure it still had approximately $6,000,000 worth of unliquidated assets. Furthermore, the Company later found it necessary to recall three bargaining unit employees to help liquidate the Company. While the Trustee may have been required to obtain the bankruptcy court's authorization before granting concessions, the Trustee could have bargained subject to that approval. The Board reasonably could conclude that, had the Trustee bargained in February and March, the Union would have had some leverage in obtaining concessions. The purpose of the limited backpay requirement in such circumstances is not to punish, but to create an incentive for the Company to bargain in good faith. Ensuring meaningful bargaining comports with the primary objective of the Act. Morrison Cafeterias Consolidated, Inc. v. NLRB, 431 F.2d 254, 258 (8th Cir.1970). We therefore hold that the Board's choice of the limited backpay remedy in the instant case was well within the broad remedial discretion granted by the Act. Phelps Dodge Corp. v. NLRB, 313 U.S. 177, 189-200 (1941).
 
 
 34
 Although we find it a close question, we believe that requiring a minimum of two weeks backpay likewise serves to effectuate the remedial purpose of the Act. We recognize that the ability of the Trustee to make cash concessions at the time of closure was limited, and we are aware that the Union already has enjoyed some of the benefit it could have hoped to attain from bargaining--the recall of three unit employees to assist in the liquidation. Nevertheless, three years after the plant shutdown, the Union can hardly hope to attain the same benefits from bargaining that might have helped ease the employees' transition into a new line of work had bargaining taken place immediately upon closure. The Board's adjustment takes into account the changed circumstances since the closing, and two weeks of backpay for seven employees represents an insubstantial amount in comparison to the assets that the Company then held. Moreover, the minimum pay period may well discourage premature impasse in the bargaining that is to ensue. We therefore conclude that imposing the minimum backpay period is not punitive and falls within the discretion granted the Board.
 
 
 35
 We find, however, that we must comment on one aspect of the future compliance proceeding. The Board claims that the Trustee's continued refusal to bargain after the Board issued its order has expanded his liability well beyond the two week period. The Board reasons that, since the Trustee could have bargained immediately after the decision and thereby have minimized his monetary obligations, he now must be saddled with the full $55,000 liability set aside by the bankruptcy court. We find the Board's argument unpersuasive.
 
 
 36
 To evaluate the Board's argument, we turn for guidance to the analogy found in an employer's refusal to bargain with a newly certified union to obtain review of the Board's certification decision. In Ex-Cell-O Corp., 185 N.L.R.B. 107 (1970), enforced sub nom. I.U.E. v. NLRB, 449 F.2d 1058 (D.C.Cir.1971), the Board held that it would not order an employer to make employees whole for the time period during which the employer refused to bargain with the Union after certification. Since a refusal to bargain is the only statutory method available for an employer to challenge the Board's certification, the Board concluded that "where the wrong in refusing to bargain is, at most, a debatable question, though ultimately found a wrong, the imposition of a large financial obligation on such a respondent may come close to a form of punishment for having elected to pursue a representation question ... to the courts." Id. at 109.[5] Reviewing courts have approved the Board's policy decision that "make whole" orders should be issued only when the employer has no "debatable" defense for its refusal to bargain. NLRB v. Food Store Employees Local 347 (Heck's Inc.), 417 U.S. 1 (1974); United Steelworkers v. NLRB, 430 F.2d 519, 522 (D.C.Cir.1970) (Board warranted in refusing to grant such a remedy when the employer "desired only to obtain an authoritative determination of the validity of the Board's decision."). The Board consistently has declined to issue make whole remedies unless the employer's defense for refusing to bargain is patently frivolous. Heck's Inc., 215 N.L.R.B. 765, 768 (1974).
 
 
 37
 We find such reasoning to have equal force in the instant case. Refusing to bargain was the only means available to the Trustee to challenge what he considered an erroneous decision. Computing the sliding backpay requirement from the date of the Board's decision in our view imposes too harsh a condition on the employer's ability to obtain judicial review under Sec. 10(f) of the Act, 29 U.S.C. Sec. 160(f) (1976).[6] The Board has asserted no claim that the Trustee's refusal to bargain was other than "debatable." Indeed, until today's decision in the instant case, we know of no case in which an appellate court has addressed the Trustee's duty to bargain about the effects of his decision to terminate operations. We therefore hold that the Board cannot penalize the employer for challenging a Transmarine order in good faith by imposing monetary liability retroactively to its refusal to bargain after the Board's decision. The Transmarine period therefore commences from the date of this opinion.
 
 
 38
 Our ruling that the Transmarine order cannot be computed retroactively may conceivably give employers an incentive to disobey Board orders until review can be obtained. Nevertheless, while we eschew such dilatoriness, delay to some extent is built into the structure of the Act. Moreover, if the employer can proffer no "debatable" defense for its refusal to comply with the Board's Transmarine order, then liability may be computed from the date of the Board decision.
 
 
 39
 To summarize: we hold that substantial evidence supports the Board's finding of violations of Secs. 8(a)(5) and 8(a)(1); in that respect we deny the Trustee's petition to review and to set aside the Board order, and we grant the Board's cross-application to enforce. Our enforcement of the Board's order, however, is conditioned upon its computation of the Transmarine backpay period from the date of this opinion.
 
 
 40
 No costs.
 
 
 41
 MODIFIED AND, AS MODIFIED, ENFORCED.
 
 
 42
 COFFEY, Circuit Judge, dissenting.
 
 
 43
 I agree with the majority's holding that the bankruptcy trustee acted lawfully in terminating Seeburg Corporation's operations without prior consultation with the Union. However, I respectfully dissent as I disagree with the conclusion of the National Labor Relations Board and the majority that the Bankruptcy Trustee Yorke committed an unfair labor practice by refusing to bargain in good faith with the Union subsequent to the termination of the corporation's operations. This case raises vitally important questions concerning the relative jurisdictional roles of the bankruptcy court and the NLRB in the context of Chapter XI bankruptcy proceeding, questions of critical importance not only to the respective tribunals but to future litigants as well as the entire bench and bar. The majority's rote and mechanistic application of principles that may be appropriate in the normal employer-employee relationship ignores the fact that this case arises in the context of a Federal Bankruptcy Chapter XI proceeding. Furthermore, the majority fails to respect the severe limitations imposed on the authority of Chapter XI Bankruptcy Trustees, thus encroaching on the Bankruptcy Court's exclusive jurisdiction over Chapter XI bankruptcy proceedings. In failing to adequately consider the limited powers of a Trustee in bankruptcy, the majority's decision undermines Congress's goal in enacting Chapter XI of the Federal Bankruptcy Act, that of preserving the viability of financially troubled business entities whenever possible. See, In re Huntington, Ltd., 654 F.2d 578 (9th Cir.1981). The majority's decision makes virtually impossible the Trustee's "thankless task of determining who should share the losses incurred by an unsuccessful business and how the values of the estate should be apportioned among creditors ...." S.Rep. No. 95-989 (95th Cong. 2nd Sess. 10 reprinted in 1978 U.S.Code Cong. & Ad.News, 5787, 5796) and, furthermore violates Congress's purpose, expressed in the National Labor Relations Act, of achieving industrial harmony and prosperity by "recogniz[ing] the rights of all interested parties in labor relations ... be[ing] scrupulously fair to each--the employer, the employees, and the public." H.R.Rep. No. 245, 80th Cong., 1st Sess. (1947) reprinted in 1 NLRB, Legislative History of the Labor Management Relations Act, 1947 at 295.
 
 I.
 
 44
 To facilitate the goals of Chapter XI, Congress has vested the bankruptcy court with exclusive jurisdiction over the entire Chapter XI bankruptcy proceedings, and has delegated extremely limited authority to the Trustee to administer the debtor's estate. The Chapter XI Trustee, an officer of the bankruptcy court, derives his authority exclusively from the Bankruptcy Act, and his power to act independently of the bankruptcy court is extremely circumscribed. The court in In Re Transatlantic and Pacific Corp., 216 F.Supp. 546, 552 (S.D.N.Y.1963) recited:
 
 
 45
 "The Trustee's activities are specifically circumscribed by the Bankruptcy Act. His actions must be compatible with the bankrupt's best interests as well as the interest of the bankrupt's creditors. 2 Collier, Bankruptcy 1737 (Moore Ed.1962). The contention that the Trustee possesses the same unlimited powers ... as did the bankrupt before the bankruptcy is wholly without merit." (emphasis added).
 
 More recently, the Ninth Circuit stated:
 
 46
 "A debtor in possession or a receiver under Chapter XI of the Bankruptcy Act is, in a real sense, not the same entity as the pre-bankruptcy company. It is '[a] new entity ... with its own rights and duties, subject to the supervision of the bankruptcy court.'
 
 
 47
 * * *
 
 
 48
 * * *
 
 
 49
 '[i]t is well settled bankruptcy law that on important decisions, whatever their character, the Trustee must get the court's approval.' "
 
 
 50
 Local Joint Executive Board v. Hotel Circle, 613 F.2d 210, 213, 216 (9th Cir.1980) (emphasis added).
 
 
 51
 Viewing the facts of this case in their proper context, that of a Chapter XI bankruptcy proceeding, it is clear that the Trustee Yorke acted reasonably under the circumstances. Yorke was appointed Trustee of a corporation in dire financial straits, with its financial position deteriorating hourly. Yorke recognized that swift action was necessary if he was to have even a glimmer of hope of fulfilling his duty of protecting the interests of the corporation's creditors by salvaging even a small part of the corporation's assets and that the only reasonable course of action was to expeditiously close down the plant. He promptly petitioned the bankruptcy court and obtained authorization to terminate the company's operations and lay off the remaining employees. The Union responded to the Trustee's court-approved action taken to protect the best interests of all the corporation's creditors, with the following letter:
 
 
 52
 "Gentlemen:
 
 
 53
 "The undersigned represents Local 743 IBT. The union has a collective bargaining agreement covering the employees of Seeburg Corporation. As you are well aware, this agreement governs the wages, hours and working conditions of those employees.
 
 
 54
 It is apparent to the undersigned that the rights of these employees are being seriously undermined. It has come to our attention that numerous employees whom we represent are being transferred to do work for different companies within your corporate structure and that work, covered by our contract, is being performed elsewhere. It has also come to our attention that the remaining employees of Seeburg Corp. have been locked out as of February 11, 1980....
 
 
 55
 This is also to demand that an immediate meeting be set up so that we can discuss the decision and effects that your action has on our bargaining unit employees....
 
 
 56
 What were the reasons that the Seeburg employees were denied the ability to come to work on February 11, 1980. Will they be transferred to other payrolls of either Choice Vend, XCor or any other companies under those companies' control? What has happened to the Seeburg supervisory personnel? Have they been transferred to either Choice Vend, Xcor or any companies under those companies' control?
 
 
 57
 Third, are you aware of any prospective purchasers of the Seeburg Corporation? If so, please identify their names and addresses. If a sale or other disposition of the Seeburg Corporation is contemplated, please inform us what will happen to the existing facility, such as the property, fixtures, machinery, trucks, furniture, etc.? In particular, we would desire to know if there will be a sale or transfer to other companies within the Xcor Corporation. If there will be acquisition by another Xcor Corporation company, we would like to know the intentions of Xcor concerning future employment of the managerial, supervisory, or other non-union employees who have been working for Seeburg. This would also include any transfer of employees to Choice Vend. Further, we would desire to know what will happen to existing accounts receivable and payable, existing lease agreements or contracts, other existing liabilities as well as goodwill. We would further desire to know the disposition of any existing commitments to customers or creditors. We are particularly interested in knowing what will be the disposition of work done by Seeburg employees covered by our collective bargaining agreement. Will that work be transferred to any other entity within the Xcor Corporation or Choice Vend?
 
 
 58
 Please be advised that we expect our collective bargaining agreement to be abided by and we expect a response to this letter by the close of business February 22, 1980. Failure to answer this letter by the time indicated will necessitate the institution of the proper proceeding."
 
 
 59
 Trustee Yorke responded to this letter stating:
 
 
 60
 "I am in receipt of your letter dated February 15, 1980. Please be advised that the undersigned was appointed Trustee on February 4, 1980. Be further advised that the Trustee discontinued the operation of the business and has no employees.
 
 
 61
 "In reply to your questions, Excor is a publicly owned company. Consolidated Entertainment owns all the stock of the Seeburg Corporation. I do not know who owns Choice Vend. I do not know if Choice Vend or Excor have any collective bargaining agreements with labor organizations.
 
 
 62
 "If there is any further information you desire, I will be happy to furnish same."
 
 
 63
 (Emphasis added).
 
 
 64
 The Union's "shotgun" letter demanded that Yorke, the trustee of a multimillion dollar corporation appointed less than two weeks earlier, provide extensive and detailed information such as "what will happen to existing accounts receivable and payable, existing lease agreements or contracts, other existing liabilities as well as goodwill." It is absurd to expect Yorke to provide on such short notice the particularized data and accounting information requested by the Union, information which was certainly not available to Yorke, even during this computerized age, at this early stage of the Chapter XI proceedings.
 
 
 65
 Contrary to the National Labor Relations Board's conclusion, I would hold that the Trustee's letter could not under any circumstances be interpreted as a refusal to bargain; rather, the letter plainly and unambiguously concluded by stating: "If there is any further information you desire, I will be happy to furnish same." Thus, with those words, the Trustee Yorke issued an open-ended invitation to the Union to contact him if they desired any further information, an invitation which the union rejected. To hold that Yorke's letter was anything other than an open-ended invitation to the Union for further dealings is to "stifle the promptings of common sense." Planned Parenthood Ass'n of Chicago v. Kempiners, 700 F.2d 1115, 1137 (7th Cir.1983). The Trustee's court-approved termination of operations at the plant and responding to the Union's requests as he did were, in fact, all that a bankruptcy Trustee could have been expected to do under the circumstances; any further action by the Trustee Yorke would have been inconsistent with his limited powers as a bankruptcy Trustee since, as discussed more fully below, a bankruptcy Trustee absent prior court approval is without authority (1) to make important decisions on behalf of the bankrupt corporation; or (2) to adopt an executory contract, such as a collective bargaining agreement.
 
 
 66
 It is clear that the Trustee was not authorized to bargain with the Union without first receiving the approval of the Court. In light of the fact that "it is well settled bankruptcy law that on important decisions, whatever their character, the Trustee must get the court's approval" Hotel Circle, 613 F.2d at 210, bargaining with a Union over the effects of the plant closing (e.g. severance pay, payments into the pension fund, etc.) obviously would entail making "important decisions" affecting the bankrupt corporation. Thus, the Trustee would be engaging in an exercise in futility were he to meet with the Union in an attempt to bargain, as he was without authority to bind the bankrupt corporation absent specific prior approval of the bankruptcy judge. If, on the other hand, the Trustee did purport to bind the bankrupt corporation, he would breach his duty as an officer of the court by acting on "important matters" without prior court approval.
 
 
 67
 Yorke was without authority to immediately accede to the Union's request to bargain, since the powers of the Trustee are limited as "it is improper for a Trustee to assume executory contracts on his own responsibility." 4A Collier on Bankruptcy, Paragraph 70-43(5) at 531 (14th Ed.1976); "the assumption ... of executory agreements affects the outcome of the chapter [XI] proceeding and should proceed under the supervision of the court." Hotel Circle, 613 F.2d at 216. The limitation on the Trustee's power to assume executory contracts becomes especially significant in this context as a collective bargaining agreement between a union and a bankrupt corporation is an executory contract. In re Brada Miller Freight System, 702 F.2d 890 (11th Cir.1983); In re Bildisco, 682 F.2d 72 (3rd Cir.1982), cert. granted, --- U.S. ----, 103 S.Ct. 784, 74 L.Ed.2d 992 (1983); Hotel Circle, 613 F.2d at 213; Shopman's Local 455 v. Kevin Steel Products, Inc., 519 F.2d 698 (2d Cir.1975). Furthermore, where a successor employer, such as a Chapter XI Trustee, has chosen to act in a conformance with the terms of a collective bargaining agreement, that successor may be found to have assumed the collective bargaining agreement. cf. NLRB v. Burns International Security Service, Inc., 406 U.S. 272, 291, 92 S.Ct. 1571, 1584, 32 L.Ed.2d 61 (1972). Thus, if the Trustee had actually instituted bargaining with the Union without first securing the court's approval, he may have been deemed to have tacitly assumed the collective bargaining agreement by acceding to its terms.
 
 
 68
 Nevertheless, the Trustee did not close the door on the Union's request to bargain. Rather, Yorke specifically informed the Union that he had been appointed bankruptcy Trustee of the corporation and told the Union "if there is any further information you desire, I will be happy to furnish same." The Union, fully aware that Yorke was acting as bankruptcy Trustee of the corporation, chose to blatantly ignore this invitation for further dealings, even though, as a matter of law, the Union, like all other citizens dealing in bankruptcy matters, is charged with knowledge of the limitations on the Trustee's powers to act without court approval. "Parties dealing with a receiver are charged with knowledge of the extent of any restriction upon his authority." Hotel Circle, 613 F.2d at 210; In re Yellow Transit Freight Lines, 207 F.2d 602, 606 (7th Cir.1953). Despite their knowledge that the corporation was in receivership and the limitations on the Trustee's powers, which the law properly holds them to have, the Union ignored, without even so much as the courtesy of a phone call or a letter, the Trustee's invitation to contact him for more information. Instead, a mere seventy-two hours after Yorke wrote his letter inviting the Union to contact him for further information, the Union filed an unfair labor practice charge with the NLRB without making any attempt to deal directly with Yorke. It is clear that it was the Union, and not the Trustee, who acted in bad faith in choosing to ignore the limitations on Yorke's power to act without the court's prior approval. The NLRB, despite their supposed legal expertise, compounded the problem by ignoring the restrictions on the Trustee's power to act without prior court approval and taking the myopic and short-sighted view that the Trustee should be held to the same standards as a financially sound corporation.
 
 
 69
 The appropriate course of action for the Union to have followed in response to Yorke's invitation for further dealings would have been to respond to Yorke's letter of invitation and then the Trustee could go to the Bankruptcy Court to seek authorization to bargain. The Union would be free to appear before the Bankruptcy Court as well, since a Bankruptcy Court has broad discretion to permit interested parties to appear before it and be heard. In re Penn-Dixie Industries, Inc., 9 B.R. 936 (S.D.N.Y.1981); In re Citizen's Loan & Thrift Co., 7 B.R. 88 (Bkrtcy.N.D.Iowa 1980). If the Bankruptcy Court refused to allow the Trustee to bargain, or if the Trustee subsequently failed to bargain in good faith, then, and only then, should the Union be permitted to bring an unfair labor practice charge before the NLRB. Undue encroachment by the NLRB in the Bankruptcy Court's exclusive jurisdictional sphere would be avoided, or at least minimized, by affording the Bankruptcy Court an opportunity to act within their proper realm before instituting an unfair labor practice proceeding with the NLRB. The course of action adopted by the Union and the NLRB in this case, on the other hand, fails to respect the authority of the Bankruptcy Court and the severe limitations on a bankruptcy Trustee's powers. In sanctioning the Union's actions, the majority's decision will inevitably lead to jurisdictional conflicts between two separate federal tribunals, the Bankruptcy Court and the NLRB.
 
 II.
 
 70
 This is a case of first impression involving two vitally important, though conflicting, national policies: the revitalization of financially troubled business enterprises and the regulation of labor-management relations through collective bargaining. As a case of first impression, this court's decision will have a direct impact on the resolution of future cases pertaining to the scope of a Chapter XI bankruptcy Trustee's duty to bargain with the bankrupt corporation's unionized employees. Therefore, I believe it is essential for this court to achieve an equitable balance between the goals of revitalizing financially troubled corporations and encouraging harmonious labor relations, a balance which will not frustrate the financial recovery of corporations involved in Chapter XI bankruptcy proceedings. I believe the majority opinion in this case fails to achieve this equitable balance, and rather takes a myopic and short-sighted view of the critical interests involved in Chapter XI bankruptcy proceedings. As the Eleventh Circuit recently stated:
 
 
 71
 "We do not contemplate that Congress intended the ultimate fate of a corporation under Chapter XI to rest so largely in the hands of the company's protected employees. There simply exist too many other critical interests, those of other employees, creditors, and shareholders, the protection of which provides the stimulus for the bankruptcy laws, for this Court to conclude that the collective bargaining agreement was meant to hold a stranglehold position ...."
 
 
 72
 In re Brada Miller Freight System, 702 F.2d 890, 897 (11th Cir.1983).
 
 
 73
 I dissent as I believe the majority's decision foists an unreasonable burden on business enterprises involved in Chapter XI bankruptcy proceedings. It is the height of absurdity for the NLRB to exert a fatal chokehold on Congress's specific intent to allow mortally wounded businesses a chance to make a financial comeback at a time when our basic industries are struggling to survive. Courts not only have the obligation to interpret and apply the law, but must also continue to be aware of economic reality while showing fiscal responsibility in their decisions and must not decide cases in an economic vacuum.
 
 
 
 *
 Of the Second Circuit, by designation
 
 
 [1]
 The Administrative Law Judge (ALJ) found that Seeburg Service Parts Co. and Seeburg Corp. constituted a single integrated business enterprise. The Trustee filed no exception to that finding
 
 
 [2]
 In view of their direct bearing on the issues before us, we set forth at length the pertinent portions of the Union's letter of February 15 and the Trustee's reply of February 25
 
 
 [3]
 The complaint alleged that the Company had violated the Act by transferring employees without prior notification to the Union and by refusing to furnish information that the Union requested. The Regional Director chose not to press these charges
 
 
 [4]
 Although we have some difficulty imagining that a Trustee in Bankruptcy would not inquire from the outset whether employees on the payroll were unionized, the ALJ credited Yorke's testimony that he did not know of the Union's presence at the plant
 
 
 [5]
 The Board in Ex-Cell-O Corp. also premised its conclusion on the Supreme Court's admonition in H.K. Porter Co. v. NLRB, 397 U.S. 99 (1970), that the Board's remedial power does not extend to compelling an agreement. In the Board's view, assessing financial liability for failure to bargain impermissibly assumed that the parties would have reached some agreement. 185 N.L.R.B. at 109-10
 
 
 [6]
 We note that a conditional backpay award differs substantially from the more conventional backpay order. The former is intended to create incentive for bargaining; the ultimate monetary liability is to be assessed contingent on the length of time needed to conclude an agreement or reach impasse. The straight backpay order, on the other hand, is intended to remedy acts that have already taken place; there is nothing contingent about it. When an employer challenges a backpay order, it does not lose anything--the interest on any ultimate award will be balanced roughly by its use of the money in the interim. If the backpay award were assessed retroactively against an employer in the instant situation, however, the employer would be punished severely by challenging the order: the employer's liability would increase with each passing day