**CLEAR PINE MOULDINGS, INC., Petitioner-Cross-Respondent,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent-Cross-Petitioner.**

No. 78–3547.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 14, 1980.

Decided July 25, 1980.

Rehearing Denied Nov. 24, 1980.

---

722

Verne W. Newcomb, argued, James B. Ruyle, Newcomb, Sabin, Meyer & Schwartz, Portland, Or., on brief, for petitioner-cross-respondent.

Barbara A. Atkin, Washington, D. C., argued, Andrew F. Tranovich, Washington, D. C., on brief, for respondent-cross-petitioner.

Before KENNEDY and PREGERSON, Circuit Judges, and BONSAL *, District Judge.

PREGERSON, District Judge:

Clear Pine Mouldings, Inc. ("Clear Pine" or "the company") petitions for review of a decision by the National Labor Relations Board ("the Board") that Clear Pine violated §§ 8(a)(1), (3), and (5) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1), (3), and (5), by improperly interrogating and reprimanding employees, by unilaterally altering the terms of employment, and by refusing to bargain in good faith with the International Woodworkers Ass'n (the union). Clear Pine also petitions for review of the Board's bargaining order. The Board cross-petitions pursuant to 29 U.S.C. § 160(e) for enforcement of its order.

This court will enforce the Board's decision and order if the Board correctly applied the law and if its findings of fact are supported by substantial evidence on the record as a whole. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951); *Los Angeles Marine Hardware Co. v. NLRB*, 602 F.2d 1302, 1305 (9th Cir. 1979). When conflicting testimony is presented at a hearing, the administrative law judge, having observed the witnesses and heard the testimony, is required to determine the credibility of witnesses. *Great Chinese American Sewing Co. v. NLRB*, 578 F.2d 251, 254 (9th Cir. 1978); *Penasquitos Village, Inc. v. NLRB*, 565 F.2d 1074, 1078–79 (9th Cir. 1977). Accordingly, in reviewing the record, we give special weight to the administrative law judge's determinations concerning the credibility of witnesses. *Id.* at 1079.

* The Honorable Dudley Bonsal, Senior United States District Judge for the Southern District of New York, sitting by designation.

## §§ 8(a)(1), 8(a)(3) VIOLATIONS

The union was first certified as the collective bargaining representative of the company's production and maintenance employees on August 4, 1965. During the ensuing years, the union and the company entered into a series of collective bargaining agreements, the last of which expired on June 1, 1977.

In March 1977, in anticipation of forthcoming contract negotiations, the union began a membership drive among employees who had not yet joined. At an organizational meeting on March 25, the union urged employees to join the union to ensure its strength during negotiations. Some employees who attempted to speak on behalf of the company were shouted down. At this meeting approximately 40 employees joined the union and signed dues check-off authorization forms. All forms were then delivered to the company.

Immediately after the company received the check-off authorizations, employees Andrew Randle and Laura Stephens were called into the office of Personnel Manager Lockyear who asked them why they had joined the union. He also asked Stephens the name of the person who had solicited her union membership and whether the solicitation had occurred on the job.

On June 7, a week after the expiration of the contract, Lockyear interviewed and hired job applicant Kenneth Hertz. During the interview, Lockyear raised the subject of the union, told Hertz he could choose whether or not to join, and then attempted to persuade Hertz not to join.

Later that summer on July 13, Plant Superintendent Hensley summoned employee Darlene Forseth to his office. Forseth, a leading union adherent and a member of the in-plant negotiating and grievance committee, had worked for the company for four years as a vinyl machine operator. She had a good work record and had never

suffered a reprimand. When Forseth arrived at Hensley's office, she found other members of the union grievance committee present, as well as Hensley, Lockyear, and three plant employees, Mary Ann Tooley, Wrilda Chancellor, and Elvis Jones, who had apparently lodged complaints against Forseth. Lockyear handed Forseth a written reprimand alleging that she had engaged in union activity during working hours in violation of Article XX of the Collective Bargaining Agreement. He informed Forseth, in non-specific terms, that her harassment of and threats against other employees prompted his reprimand.

The administrative law judge found, and the Board agreed, that the company's treatment of Randle and Stephens violated § 8(a)(1) and its treatment of Forseth violated §§ 8(a)(1) and (3). The administrative law judge found that Lockyear questioned Randle and Stephens to investigate rumors, circulating among employees, concerning the employer's future course of conduct if the union were defeated. The administrative law judge found, however, that since the rumors were couched in terms of possibilities rather than in certainties, the company had no legitimate reason to interrogate the employees. The company now contends that its interrogation of Randle and Stephens was justified since it felt compelled to investigate what it regarded as unfavorable and untrue rumors about the company.

Section 7 of the Act grants employees "the right to self-organization, to form, join or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining . . . ." 29 U.S.C. § 157. Section 8(a)(1) of the Act implements this guarantee by making it an unfair labor practice to "interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in [§ 7]." 29 U.S.C. § 158(a)(1).

■ Interrogation of employees concerning union activities is not a per se violation of § 8(a)(1). *NLRB v. Super Toys, Inc.,*

458 F.2d 180, 182 (9th Cir. 1972). The test to determine if a § 8(a)(1) violation has occurred is whether, under all the circumstances, the interrogation reasonably tends to restrain or interfere with the employees in the exercise of their protected § 7 rights. *Penasquitos Village, Inc. v. NLRB,* 565 F.2d 1074, 1080 (9th Cir. 1977).

■ There is no evidence in the record that the company assured Randle and Stephens against reprisal or that Lockyear told them why they were being questioned. *See NLRB v. Varo,* 425 F.2d 293, 298 (5th Cir. 1970). Moreover, the record supports the finding that the rumors were too speculative to be taken seriously. Ron Boothe, the employee who reported the rumors to Lockyear, testified that he did not believe the rumors. Plant Superintendent Hensley testified that he found the employees unconcerned about the rumors. We find that the administrative law judge properly rejected the company's position and correctly characterized the interrogations as coercive. Therefore, we affirm the Board's conclusion that the interrogation of Randle and Stephens violated § 8(a)(1) of the Act.

As to Kenneth Hertz's employment interview, the administrative law judge found that the company used the interview coercively in violation of § 8(a)(1) of the Act to dissuade Hertz from joining the union. Clear Pine now argues that this finding is unsupported by the record and contradicted by the fact that Lockyear did not expressly threaten Hertz during the interview.

■ We disagree. While the testimony of both Hertz and Lockyear was vague, Hertz's testimony does support the conclusion that Lockyear's questioning carried with it the clear implication that the answers given by Hertz affected his chances of employment. *W. A. Sheaffer Pen Co. v. NLRB,* 486 F.2d 180, 182 (8th Cir. 1973); *NLRB v. Bighorn Beverage,* 614 F.2d 1238, at 1240 (9th Cir. 1980). The administrative law judge credited Hertz's version of events and since the administrative law judge had the benefit of observing the witness's demeanor, we can reverse only if a clear pre-

ponderance of the evidence convinces us that he was incorrect. *NLRB v. Broadmoor Lumber Co.*, 578 F.2d 238, 241 (9th Cir. 1978). Because we find it reasonable to infer coercion when a personnel manager urges a prospective employee not to join the union, we affirm the Board's conclusion that the company violated § 8(a)(1) in this instance. The absence of express threats by the company does not alter that conclusion. *See NLRB v. Ayer Lar Sanitarium*, 436 F.2d 45, 49 (9th Cir. 1970).

 Next the administrative law judge found that the company's reprimand of Darlene Forseth violated §§ 8(a)(1) and (3) of the Act in that the company deliberately attempted to discourage union activity by disciplining Forseth, an active and visible union member. Under § 8(a)(3) an employer may not discriminate against an employee because of the employee's union activities or sympathies. The employer's purpose in discriminating, however, is controlling. Without a finding of anti-union animus, there is no unfair labor practice unless the conduct was so inherently destructive of employee rights that the unavoidable and foreseeable consequences of the employer's conduct bear their own indicia of motive. *NLRB v. Triumph Curing Center*, 571 F.2d 462, 474 (9th Cir. 1978). Moreover, the determination of motive is particularly within the purview of the Board. *NLRB v. Fort Vancouver Plywood Co.*, 604 F.2d 596, 600 (9th Cir. 1979). In determining motive, the Board may rely on circumstantial as well as direct evidence, and its inferences and findings must prevail where they are reasonable and supported by substantial evidence. *Folkins v. NLRB*, 500 F.2d 52, 53 (9th Cir. 1974).

 Despite Clear Pine's contention that the meeting at Hensley's office merely provided an opportunity for the complaining employees, the union, and Forseth to confront each other, evidence of the company's improper motivation is considerable. Lockyear asked Forseth no questions nor did he inform her of the specific incident triggering the reprimand. In fact, at the meeting only employee Chancellor mentioned an in-cident, one occurring in May when Forseth and Chancellor had discussed the union while returning from a work break. Forseth assumed that the May incident was the basis of the reprimand and refused to sign the warning. In fact, the basis for the reprimand was Forseth's remarks that morning to employee Mary Ann Tooley about the upcoming contract negotiations. Lockyear did not conduct an investigation into the alleged harassment of Tooley nor did he warn Forseth as required by standard company policy. In fact, this was the first written warning Lockyear had ever issued to anyone. Moreover, Chancellor admitted at the hearing that she had never been harassed by Forseth. Finally, the evidence showed that two other employees had conducted union business while on the job, but had escaped discipline. In light of these facts, it was reasonable for the Board to conclude that Darlene Forseth was reprimanded not because of her alleged harassment, but because of her status as a leading union activist.

### § 8(a)(5) VIOLATION

The union opened contract negotiations by a letter dated March 14 containing the union's initial contract demands. The union submitted additional matters for negotiation by a letter dated March 31. Between May 16 and August 1, 1977, when the union struck, the parties engaged in five bargaining sessions.

At the first session on May 16, the union presented the local's contract proposals. These "local openers" generally covered 23 areas of the contract, including wages, pensions, and health and welfare benefits, and the adoption of a union shop clause. The company presented no counterproposals at this meeting.

At the second session on June 9, the union presented the terms of the industry settlement between the International and several large industry employers. The union then requested the company's counterproposal, but the company did not respond. Instead, the company objected to accepting the industry settlement. It argued that its

operations differed from the integrated wood products companies that had signed the industry contract. The company maintained that its actual competitors were other moulding operations in Northern California whose contracts did not expire until fall of 1977, and it suggested postponing contract negotiations until those California companies signed their new contracts. The union emphasized that it wanted to bargain immediately and demanded to know if the company was unwilling to negotiate until August. The company said it would negotiate, but that it would not be the first to sign a contract since it had signed first in 1975 and had suffered as a consequence.

At the third bargaining session on June 24, the union again asked for wage proposals, but the company presented none, emphasizing the unfair position in which it had been placed. The union reassured the company that it did not intend to hold the company to the industry settlement, but that it expected some concrete company proposals.

Clear Pine did express its dissatisfaction with the union's proposed health and welfare premium rates which were linked to the industry settlement. The company was willing to pay the premiums at the current rates although it was uncertain whether the health and welfare trusts would accept those lower payments. The company did not, however, indicate that it intended to discontinue all payments to the trusts.

At this meeting the parties also discussed whether the contract had actually terminated or whether it was open for modification only. The union, concerned about its flagging membership and recent employee resignations, suggested that the contract remain in effect until impasse. This was rejected by the company who instead suggested an interim agreement that would expire after other moulding companies in Northern California had settled their contracts with the union. Finally at the meeting the union said it was willing to discuss any proposal offered by the company.

At the fourth meeting on July 8, the union again asked for the company's proposals, but none were forthcoming. The company did tell the union that the health and welfare trusts would not accept the premium payments the company had tendered at the lower rates. After a recess, Clear Pine finally presented a written proposal for an interim agreement with a letter stating that the California contracts would not be renegotiated until September. The proposal provided for the continuation of the prior agreement for 60 days and thereafter until either party gave 10 days notice. In addition, any negotiated wage increases would be retroactive to June 1, 1977.

After a caucus, the union rejected the ten day termination clause, the absence of any provision regarding the health and welfare trusts and the absence of assurances of a union security clause in the long-term agreement. It asked the company for an economic proposal since the interim proposal did not contain an economic offer. The company presented nothing further and the meeting adjourned.

On July 10, the union held a membership meeting and told its members that the company had failed to make an economic offer. The membership discussed the matter, voted strike authorization at the discretion of the bargaining committee, and rejected the proposed interim agreement. The union shop question did not emerge as a strike issue.

At the fifth meeting on July 26, the company said it would not pay the industry health and welfare premiums and that it was investigating other plans, including one equal to the present plan. The company did not explain its position any further nor did it express an intention to cease its contribution to the existing plan. It did modify its interim contract proposal and offered to continue remitting the lower premiums to the health plan and to consider another carrier supplying the same benefits.

The union presented a seven point counteroffer which the parties discussed and the company rejected. The union also withdrew its demand for a union shop clause in the long-term agreement. The company

did not offer any economic proposals and the meeting ended subject to call by the Federal Mediation and Conciliation Service.

Three days later the union negotiating committee voted to strike because the company had failed to make any economic offers. The strike began on August 1. Eighty-eight employees were absent from work. By August 15, all of the strikers had been replaced. The strike ended November 28 when the union unconditionally offered to return to work.

Further bargaining sessions on August 2 and September 2 proved unproductive. On October 14, the company finally presented a package proposing an 8% wage increase and the purchase of a health and welfare plan equivalent to the existing union plan. The company had, however, already implemented a health and welfare plan through Aetna, effective October 1, without notifying the union.

The Board found that the company's refusal to present an economic offer until its competitors had negotiated their contracts was a refusal to bargain in good faith in violation of §§ 8(a)(1) and (5). The Board also found that the company's unilateral implementation of the Aetna plan without notifying the union violated §§ 8(a)(1) and (5) of the Act. The Board concluded that Clear Pine's bad faith bargaining directly caused the August 1 strike and that the striking employees were, therefore, unfair labor practice strikers. The Board ordered the company to cease and desist its unlawful behavior, to bargain in good faith with the union, and to offer full and immediate reinstatement to all strikers who had not yet been reinstated. Finally, the Board ordered the company to make whole any employee who lost money because of the company's unilateral implementation of the Aetna health and welfare plan.

### 1. Amendment of the Complaint

Initially we must dispose of the company's contention that the administrative law judge erred when he allowed the general counsel to amend the complaint to allege new violations based on the unilateral change in the health and welfare plan.

It is settled that the Board may find an unfair labor practice when the issue has been fully litigated even though it has not been specifically pleaded in the complaint. *NLRB v. International Association of Bridge, Structural and Ornamental Iron Workers Local 433,* 600 F.2d 770, 775 (9th Cir. 1979). The Board may either render a decision upon the issues actually tried or order an amendment to conform with the proof. *Alexander Dawson, Inc. v. NLRB,* 586 F.2d 1300, 1304 (9th Cir. 1978). Here the administrative law judge adjourned the hearings for six weeks to enable Clear Pine to meet the new allegation. Clear Pine had the opportunity to prepare its defense, and the issue was fully litigated. We, therefore, find no error in the judge's decision to allow the amendment of the complaint.

### 2. Dilatory Bargaining

Section 8(d) of the Act requires an employer and the employee representative to "confer in good faith with respect to wages, hours, and other terms and conditions of employment . . . ." 29 U.S.C. § 158(d). Collective bargaining is mandatory as to subjects that fall within the statutory language of 8(d). *Chemical Workers, Local 1 v. Pittsburgh Plate Glass, Co.,* 404 U.S. 157, 185–186, 92 S.Ct. 383, 400–401, 30 L.Ed.2d 341 (1971). The parties need not bargain, however, over subjects that fall outside the statutory mandate. *See NLRB v. Cheese Barn, Inc.,* 558 F.2d 526, 529 (9th Cir. 1977).

While a union and employer may agree voluntarily not to bargain until the conclusion of negotiations involving competitors, an employer violates §§ 8(a)(5) and (1) by refusing unilaterally to bargain until his competitors complete their negotiations. *See United Mine Workers v. Pennington,* 381 U.S. 657, 666–67, 85 S.Ct. 1585, 1591, 14 L.Ed.2d 626 (1965). Moreover, good faith bargaining presupposes a desire to enter ultimately into a collective bargaining contract. While this duty does not require an agreement, it does prohibit mere pretense

at negotiations with a closed mind and without a spirit of cooperation and good faith. *NLRB v. Holmes Tuttle Broadway Ford, Inc.,* 465 F.2d 717, 719 (9th Cir. 1972).

An intent to frustrate and delay meaningful bargaining is evidenced by an unreasonable delay in making a counteroffer. *NLRB v. West Coast Casket Co.,* 469 F.2d 871, 874–75 (9th Cir. 1972). Lack of good faith in bargaining is also manifested by a unilateral change in a term or condition of employment. *Alfred M. Lewis, Inc. v. NLRB,* 587 F.2d 403, 408 (9th Cir. 1978).

■ Oftentimes it is difficult to determine whether an employer's conduct amounts to hard bargaining or an unwillingness to bargain in good faith. The validity of any such determination depends in part on an understanding of the collective bargaining process. Therefore, the Board's determination as to a party's bargaining bad faith, if supported by substantial evidence, must stand. *NLRB v. Dent,* 534 F.2d 844, 846 (9th Cir. 1976).

The company points out that at the third meeting on June 24 the parties discussed new job classifications, vacation pay, the health and welfare plan, and retroactivity of any wage increases to June 1, 1977. At the fifth meeting on July 25, the company agreed to all but two of the union's terms for an interim agreement. Moreover, at the meeting on August 2, the company responded to a new union proposal by offering to discuss a long-term contract or another interim agreement. This progress, Clear Pine contends, belies the finding that it did not present economic proposals.

■ We find Clear Pine's arguments unpersuasive. Without evaluating the merits of the substantive terms of the collective bargaining proposals, it is still apparent that Clear Pine never made specific economic proposals until October 14, five months after negotiations commenced and shortly after the Northern California companies had signed their contracts. In fact, the employer made no proposals except for a sketchy interim agreement which, it later admitted, it knew would be unacceptable.

It is true that the company discussed the union's various proposals, but it never presented concrete counterproposals when requested to do so. Rather, it complained of having to negotiate prior to its competitors. The negotiations on an interim agreement did not justify the company's refusal to propose terms for the long-term contract. The parties never agreed to postpone negotiations on the long-term contract and indeed the union requested company proposals at every meeting without success. In light of the above, there is substantial evidence to affirm the Board's findings that the company violated §§ 8(a)(5) and (1) by its dilatory bargaining.

### 3. Unilateral Health Plan Changes

■ As long as the bargaining obligation is not extinguished, the company has a continuing duty to bargain without instituting unilateral benefit changes, even after expiration of the prior agreement. *NLRB v. Sky Wolf Sales,* 470 F.2d 827, 830 (9th Cir. 1972). Health care plans are mandatory subjects of bargaining and § 8(a)(5) is violated by an employer's unilateral changes in these plans. *NLRB v. Sir James, Inc.,* 446 F.2d 570 (9th Cir. 1971); *Hinson v. NLRB,* 428 F.2d 133, 136 (8th Cir. 1970).

The company makes three arguments. First it asserts that the change was not unilateral because the union had notice. The record reflects, however, that although the parties talked about the trusts' refusal to accept lower premiums, the union insisted upon the adoption of the industry settlement and the company, without notice, actually implemented the Aetna plan. Second, the company argues that it was entitled to act because it had bargained to impasse with the union. It is hard to understand, however, how the company could bargain to impasse when it never apprised the union of the terms of the Aetna plan. *See NLRB v. Sky Wolf,* 470 F.2d at 830. Moreover, the company's dilatory bargaining in refusing to submit a concrete economic proposal to the union precludes the existence of an impasse. *NLRB v. Pacific*

Grinding Wheel Co., Inc., 572 F.2d 1343, 1349 (9th Cir. 1978).

The company's final argument is that the plans were identical so that there was no material change. This, however, is not established in the record. General Manager Turner testified that he did not know if the plans were equivalent, although others had told him they were. The union maintains that the plans are not identical. Thus, although in *Connecticut Light and Power Co. v. NLRB*, 476 F.2d 1079 (2d Cir. 1973), the Board excused an employer who changed plans, that relief was based on a specific showing that the plans were, in fact, identical. There is no such showing here. We recognize that the company was placed in a tight spot by the health and welfare trusts' eventual refusal to accept contributions that did not meet the industry settlement. To preserve any health coverage for its employees, Clear Pine had to make a decision. We cannot, however, condone Clear Pine's conduct in offering to negotiate about a plan that it had, in fact, already unilaterally adopted. Nothing precluded Clear Pine from presenting a detailed plan to the union and bargaining, if necessary, to impasse on the issue. Unfortunately, the company chose instead to act alone. We find sufficient evidence in the record to affirm the Board's conclusion that Clear Pine violated §§ 8(a)(5) and (1) by its unilateral implementation of the Aetna plan.

### BARGAINING ORDER

Clear Pine argues that the bargaining order is inappropriate because the union had lost majority status and because the union had directed a campaign of violence and intimidation against employees. We reject both arguments.

1. *Loss of Status*

This circuit has held that an employer who believes that a union may have lost majority status should properly petition the Board in that regard; in the interim, the employer is not permitted to refuse to bargain or otherwise engage in unfair labor practices. *NLRB v. Triumph Curing Cen-*

ter, 571 F.2d at 478; *NLRB v. Lee Office Equipment*, 572 F.2d 704, 707 (9th Cir. 1978). Moreover, it is reasonable to infer that Clear Pine might have caused the decline in union membership through its own unfair labor practices. Reasonable doubt as to majority status must only be asserted in good faith and may not be raised in the context of an employer's activities aimed at causing disaffection from the union. *NLRB v. Sky Wolf Sales*, 470 F.2d at 830. As this court recently stated, "It would be inequitable to allow the Company to raise the issue of the Union's majority status when the Company has actively attempted to destroy that status. To allow this defense would be to condone the independent unfair labor practices." *NLRB v. B. C. Hawk Chevrolet, Inc.*, 582 F.2d 491, 495 (9th Cir. 1978). In light of the employer's unfair labor practices outlined above, we reject the company's argument.

2. *Union Violence*

There were some acts of violence during the strike that resulted in a state court injunction on September 7, 1977, restraining the union from further such activities. Clear Pine asserts, therefore, that the *Laura Modes* doctrine prevents enforcement of the bargaining order.

This court discussed the *Laura Modes* doctrine in *NLRB v. Triumph Curing Center*, 571 F.2d at 475:

[W]here a union evidences total disinterest in enforcing its rights through the peaceful legal process provided by the Act and instead resorts to violence, the Board will refuse to issue a bargaining order, even though the employer violated the Act.

Quite simply, the Board found insufficient evidence in the record to invoke the *Laura Modes* doctrine. We agree. The record does not reflect that the union was foregoing the "peaceful, legal process."

### CONCLUSION

The Board correctly applied the law and substantial evidence on the record as a

whole supports its findings of fact. We affirm the Board's Decision and Order. The Petition for Enforcement is granted. The Board will prepare and submit an appropriate form of judgment.

AFFIRMED.