**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**EMSING'S SUPERMARKET, INC. and Rocky's Supermarket, Inc., Respondents.**

No. 87–2635.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 14, 1988.

Decided April 17, 1989.

Margaret G. Bezou, N.L.R.B., Washington, D.C., for petitioner.

J. Charles Sheerin, Law Offices of J. Charles Sheerin, Michigan City, Ind., for respondents.

Before CUDAHY, RIPPLE and KANNE, Circuit Judges.

RIPPLE, Circuit Judge.

The National Labor Relations Board (the NLRB or Board) seeks the enforcement of its order directing Emsing's Supermarket, Inc. (ESI) and Rocky's Supermarket, Inc. (RSI) to cease and desist unfair labor practices and to take certain affirmative steps designed to remedy the actions of ESI at the time of the closing of its store in August 1984.[1] For the reasons that follow in this opinion, we enforce the order of the NLRB in its entirety.

## I

## BACKGROUND

A. *History of Store Ownership*

During the time in question, ESI and RSI were owned by Alan Emsing and his wife

---

1. ESI and RSI were separate corporate entities which operated respectively Emsing's Super- market and Rocky's Supermarket.

Terri Emsing. Emsing's Supermarket had been established in 1967 by Mr. Emsing's parents. It was located in Griffith, Indiana. In 1980, Mr. and Mrs. Emsing purchased ESI from Mr. Emsing's parents. With the exception of some treasury shares retained by Mr. Emsing's father to secure the purchase note, Mr. and Mrs. Emsing became the sole shareholders of ESI. The couple controlled the company as shareholders and officers.[2] In December 1982, Mr. and Mrs. Emsing formed RSI and became its sole shareholders.[3] On January 7, 1983, Rocky's opened in Hammond, Indiana, eleven miles north of Emsing's Griffith, Indiana location.

### B. *Collective Bargaining History*

About fifteen employees worked at Emsing's before it closed in mid-August of 1984. Eight or nine of these employees were clerks who were in a bargaining unit represented by the United Food and Commercial Workers Union, Local 1460, AFL–CIO, CLC (Union).[4] The Union had represented the workers since 1970 and the most recent collective bargaining agreement (agreement or CBA) covered the period of November 1, 1980 through October 31, 1983. When the store closed, the CBA had expired but was being negotiated.

The events that led to the Union's charge of unfair labor practices began in the fall of 1983. In October or November 1983, Mr. Emsing and Arthur Primm, a Union representative, met at Emsing's to negotiate a replacement contract for the CBA that was due to expire on October 31, 1983.[5] At this meeting Mr. Primm described the requested Union modifications and Mr. Emsing responded that his finan-cial situation was deteriorating and that he would need substantial concessions to survive. *Emsing's Supermarket, Inc.*, A.L.J. Dec. Case 13–CA–24609 at 5 (Sept. 12, 1985) [hereinafter ALJ Dec.]. At the same meeting, Mr. Primm asked if Mr. Emsing would agree to continue the CBA until a new one was ratified. Mr. Emsing said, "We will see." *Id.* at 6.

A second meeting was held on December 16, 1983. Mr. Emsing presented the Union with his final proposal which called for reduced benefits and a ten percent wage reduction. Mr. Emsing began to explain his financial situation and placed his financial records on the table for inspection. However, Mr. Primm was unable to review the records and Mr. Emsing agreed that a Union auditor could inspect the books at any time. No auditors ever came to inspect the books.

During this second meeting, Mr. Emsing told the Union that his proposal could not be changed and asserted that there was no money in ESI to accommodate the Union proposals. He stated that, unless his proposals were accepted, ESI could not afford to keep Emsing's open. ALJ Dec. at 6. Mr. Primm responded that perhaps the employees would accept a wage freeze but also advised Mr. Emsing that he would recommend that the Union members reject such a proposal. Before the third bargaining session, the Union employees voted and, on Mr. Primm's recommendation, rejected ESI's proposal.

Little was accomplished at the third meeting which was held in January 1984. Mr. Primm told Mr. Emsing that the proposal had been rejected. Mr. Emsing re-

---

2. Mr. Emsing was the president of ESI and Mrs. Emsing was the secretary-treasurer. From 1981 through 1983, Alan's brother, Joseph "Butch" Emsing served as the vice president of ESI. Butch was not certain whether anyone held the office thereafter.

3. Mr. and Mrs. Emsing also served as officers of RSI: Mrs. Emsing was president and Mr. Emsing was vice president. Dave Davis, a store manager at Rocky's, served as secretary-treasurer of RSI so that he could sign checks for the corporation and accept deliveries at the store in Mr. Emsing's absence.

4. Local 1460 merged into Local 1550 in January of 1985. Local 1550 therefore became its successor in interest.

5. There is some confusion about the number of times the parties met and the dates of the negotiations, but the ALJ found that there were three meetings between Mr. Emsing and the Union representative, Mr. Primm. *Emsing's Supermarket, Inc.*, A.L.J. Dec. Case 13–CA–24609 at 5 (Sept. 12, 1985).

peated that his records were available for inspection and that his proposal was his only offer, because the store was losing money. Mr. Primm said he would still recommend rejection of the proposal.

On February 9, 1984, Mr. Primm met with members of the Union, and, although only three Union members were present, they voted two against one to reject Mr. Emsing's proposal. Mr. Primm reported the results to Mr. Emsing and asked for another meeting to make some proposals. Mr. Emsing reasserted that he had already given ESI's only proposal. Mr. Primm stated that he would need approval to strike; Mr. Emsing responded by telling him to do what he had to do but that ESI would do what was necessary to operate. ALJ Dec. at 7. On March 22, 1984, the request to strike was approved by the International Union. Before striking, Mr. Primm telephoned Mr. Emsing to see if they could work out any other proposal as the Union preferred not to strike. Mr. Emsing stated that he had expressed his position and reiterated that each would have to do whatever he felt was necessary.

During this time, Emsing's initiated a number of cost-cutting measures.[6] Also during this time, some of the employees heard rumors that the store was going to close and started an effort to bring the subject of contract ratification and strike up for a revote. This effort resulted in a Union meeting on May 23, 1984 at which the employees, this time against Mr. Primm's recommendation, voted not to strike and to accept ESI's contract offer. Mr. Primm testified that he called Mr. Emsing with the news. The ALJ, however, did not find Mr. Primm's testimony on this point to be credible and found that the call was not made. Mr. Primm testified that he instructed his secretary to type up the contract, but, from the time that the contract was ratified until the store closed, no contract was ever sent to Mr. Emsing.

Mr. Primm conceded that, as early as May 23, 1984, the period around the ratification vote, he began to hear rumors from the employees, vendors, and others that Emsing's was going to close. A number of Union employees contacted Mr. Primm to ask if the rumors were true. He told these members that, if an employer plans to close a store, "[he] will let us know. We try to set back and wait for [the employer to notify the Union]." Tr. at 504. As August approached, the rumors became more intense. Finally, an Emsing's employee contacted Mr. Primm and said that she had heard from a reliable source that the store was going to close. On August 8, 1984, Mr. Primm sent a letter to Mr. Emsing asking whether the store would be closing on August 11 as the rumors indicated. The letter stated, "If the rumor is true, I would request a meeting with you to discuss store closing." R. Vol. IV at General Counsel Ex. 5.

Mr. Emsing testified that the decision to close the store was made on August 1, 1984, and that, in individual conferences, each of the employees was told that the store would close around August 11 or 12. ALJ Dec. at 9. Mr. Primm and Mr. Emsing spoke on the telephone on August 8 or 9, and, at that time, Mr. Emsing told Mr. Primm that the store would close. Mr. Primm asked if a meeting could be set up to talk about the effects of the closing on the employees. Mr. Emsing replied that they could meet at any time and asked if Mr. Primm wanted to meet right away. Mr. Primm indicated that he was tied up and that he would get back to Mr. Emsing with a date.

During the next week, Mr. Primm began calling Mr. Emsing. These calls were made not only to set up an appointment but also because Mr. Primm had been informed that ESI had failed to remit the dues checkoff after July 5, 1984, had unilaterally discontinued making health and welfare payments under the CBA after June 1984, had unilaterally discontinued making pension payments after June 1984, and had ceased paying for accrued vacation time after the store closed. These were the unilateral changes that the General Counsel alleged violated sections 8(a)(1) and (5) of the Na-

---

6. For a description of the cost-cutting measures taken in early 1984, see *infra* note 10.

tional Labor Relations Act. 29 U.S.C. §§ 158(a)(1) & (5).

From August 11 through August 27, Mr. Primm telephoned Emsing's three to five times, but obtained an answer only once. On that occasion, Mr. Primm spoke with Mr. Emsing's brother, Joseph "Butch" Emsing. Butch Emsing stated that his brother was working at both Emsing's and Rocky's stores and that Mr. Primm might be able to contact him at Rocky's. Mr. Primm did not ask for the number at Rocky's but instead asked that Mr. Emsing return the call. Mr. Emsing testified that he was never given the message. Mr. Primm conceded that, after he spoke with Butch Emsing, he made no attempt to find the number for Rocky's. On August 27, 1984, Mr. Primm sent Mr. Emsing another letter addressed to Emsing's. The letter was sent by certified mail and, although the parties stipulated that Mrs. Emsing signed for the letter, Mr. Emsing claimed that he had no recollection of having seen the letter. Finally, by letter dated September 26, Mr. Primm referred the matter to the Union's attorneys for arbitration to recover the amount owed for the Union's August dues, health and welfare contributions, for liquidated damages for July and August, and for unspecified sums of vacation money due to three employees. On November 5, 1984, the Union filed the original charge with the Board.

## II

## DECISION OF THE NLRB

The Board found, in agreement with the administrative law judge (ALJ), that ESI had violated section 8(a)(5) and (1) of the Act, by unilaterally discontinuing payments to the benefit funds, by unilaterally discontinuing payments to employees for accrued vacation benefits, and by precluding meaningful bargaining over the closure of the store through its failure to give the Union adequate notice of its decision to close. The Board further found, in disagreement with the ALJ, that ESI and RSI are a single employer and therefore jointly and severally liable for any amount that may be due under the remedy imposed by the Board.

The Board's order directs ESI and RSI to cease and desist from the unfair labor practices. It also requires ESI and RSI to bargain with the Union, upon the Union's request, with respect to payments due under the benefit funds, the accrued vacation benefits, and with respect to the effects of the decision to close the store. ESI and RSI must also pay the employees whose jobs were terminated when the store was closed at least two weeks' wages under the Board's holding in *Transmarine Navigation Corp.*, 170 N.L.R.B. 389 (1968). The companies must also pay all delinquent contributions to the pension trust fund and to the health and welfare fund for the period from July 1 to August 11, 1984. The employees are also to be reimbursed for any expenses incurred because of the failure of the employer to make these contributions. There were also remedial provisions covering the contingency of a reopening of the store by ESI. In that case, ESI or its successor would be obligated to recognize and bargain with the Union and to establish a preferential hiring list for all employees who lost their jobs at the time of the store's closing.

## III

## STANDARD OF REVIEW

"We begin our discussion mindful of the narrowness of our review of NLRB decisions." *International Union, UAW, Local No. 1712 v. NLRB*, 732 F.2d 573, 577 (7th Cir.1984); *see Kankakee–Iroquois County Employers' Ass'n v. NLRB*, 825 F.2d 1091, 1093 (7th Cir.1987). "In reviewing the Board's decision, we must scrutinize the entire record, 'including the evidence opposed to the Board's view from which conflicting inferences reasonably could be drawn.'" *NLRB v. Burkart Foam, Inc.*, 848 F.2d 825, 829 (7th Cir.1988) (quoting *NLRB v. Adam & Eve Cosmetics, Inc.*, 567 F.2d 723, 727 (7th Cir.1977)). Nevertheless, this court will defer to the Board's judgment and the Board's factual findings shall be conclusive if supported by substantial evidence on the record con-

sidered as a whole. 29 U.S.C. § 160(e). *See Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951); *NLRB v. Stor–Rite Metal Prods., Inc.,* 856 F.2d 957, 964 (7th Cir. 1988); *Richmond Recording Corp. v. NLRB,* 836 F.2d 289, 292 (7th Cir.1987). This "court may not substitute its judgment for that of the Board when the choice is 'between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo.'*" *Penntech Papers, Inc. v. NLRB,* 706 F.2d 18, 22–23 (1st Cir.) (quoting *Universal Camera,* 340 U.S. at 488, 71 S.Ct. at 464), *cert. denied,* 464 U.S. 892, 104 S.Ct. 237, 78 L.Ed.2d 228 (1983). We shall also defer to the Board's inferences in areas where the Board is considered to have "specialized experience and expertise." *Penntech Papers,* 706 F.2d at 23; *Universal Camera,* 340 U.S. at 488, 71 S.Ct. at 464.

## IV

## DISCUSSION

### A. *Unfair Labor Practices*

The complaint charged ESI and RSI with violating sections 8(a)(1) and (5) of the Act by unilaterally ceasing to make certain contractual payments on and after June 1, 1984, by unilaterally closing Emsing's, and by refusing to bargain over the effects of that closing.

#### 1. Unilateral Contract Changes

■ The collective bargaining agreement between ESI and the Union expired on October 31, 1983. Terms of a new agreement were being negotiated. ESI continued to make contributions for its union

members to both the health and welfare fund and the pension fund after the contract expired. However, two months before the store closed, these payments ceased. Vacation benefits were paid to union employees up through the date of Emsing's closing, but ESI refused to pay the accrued vacation benefits owed to three employees. General Counsel Ex. 1(a). At the hearing before the ALJ, Mr. Emsing testified that the Union was not told that these payments had ceased. Mr. Emsing defended this unilateral action on two grounds: (1) that ESI was no longer obligated under the CBA because it had not been extended; and (2) that the Union's conduct revealed that it had abandoned the bargaining unit and waived any right to future payments.[7]

#### a. *the terms of the expired agreement were binding*

■ ESI's first defense is raised rather obliquely in this enforcement proceeding. We address it for the sake of completeness. ESI was obligated to make these payments under the CBA notwithstanding the fact that the agreement expired in October 1983. The Supreme Court has held that it is a "violation of the duty 'to bargain collectively' imposed by § 8(a)(5) of the National Labor Relations Act for an employer, without first consulting a union with which it is carrying on bona fide contract negotiations, to institute changes regarding matters which are subjects of mandatory bargaining under § 8(d) and which are in fact under discussion."[8] *NLRB v. Katz,* 369 U.S. 736, 737, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962). An employer may not make "changes in the terms and conditions of employment reflected in an expired collective bargaining agreement." *Stone Boat*

---

**7.** The ALJ found that the respondents had defended on these two grounds but the parties raised a third defense—that Mr. Emsing's reliance on the advice of counsel before making unilateral changes should have relieved ESI of liability. Respondents' Br. at 32; Petitioner's Br. at 19–20. The Board, on the authority of *J.J. Newberry Co. v. NLRB,* 645 F.2d 148, 152 (2d Cir.1981), asserts that ESI is not relieved from liability just because it acted under counsel's advice. We agree.

**8.** Section 8(d) of the Act states that

to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder, and the execution of a written contract incorporating any agreement reached if requested by either party....

29 U.S.C. § 158(d).

*Yard v. NLRB*, 715 F.2d 441, 444 (9th Cir.1983), *cert. denied,* 466 U.S. 937, 104 S.Ct. 1910, 80 L.Ed.2d 459 (1984); *see NLRB v. Carilli,* 648 F.2d 1206, 1214 (9th Cir.1981); *Clear Pine Mouldings, Inc. v. NLRB,* 632 F.2d 721, 729 (7th Cir.1980), *cert. denied,* 451 U.S. 984, 101 S.Ct. 2317, 68 L.Ed.2d 841 (1981). Instead, the employer "must maintain the *status quo* after the expiration of a collective bargaining agreement until a new agreement is reached or until the parties bargain in good faith to impasse." *Southwest Forest Indus., Inc. v. NLRB,* 841 F.2d 270, 273 (9th Cir.1988); *see NLRB v. Harvstone Mfg. Corp.,* 785 F.2d 570, 581 n. 12 (7th Cir.), *cert. denied,* 479 U.S. 821, 107 S.Ct. 88, 93 L.Ed.2d 41 (1986); *Stone Boat Yard,* 715 F.2d at 444; *Carilli,* 648 F.2d at 1214. The parties have not alleged that they reached an impasse or that negotiations were discontinued. We thus conclude that there is substantial evidence to support the Board's finding that, by unilaterally ceasing to make payments under the terms of the agreement, ESI committed an unfair labor practice in violation of sections 8(a)(1) and (5) of the Act.[9]

#### b. *the Union had not abandoned the bargaining unit*

■ Substantial evidence also supports the Board's finding that the Union did not abandon the Emsing's bargaining unit. Mr. Emsing alleged that he believed that the Union had abandoned interest in representing Emsing's employees. While the record contains evidence that would support such a conclusion,[10] there was also evidence that Mr. Emsing realized that the Union was still active. Mr. Emsing testified that, in April or May of 1984, at least six months after the CBA expired, he saw Mr. Primm posting a notice in Emsing's. Mr. Emsing admitted that the notice "said that there was to be a meeting of all the employees of Emsing's Supermarket at the Union Hall." Tr. at 818. Mr. Emsing's actions also indicated that he believed that the terms of the agreement were still binding on him. Although the CBA had expired, Mr. Emsing continued to make payments to the various Union funds through June of 1984, at least seven months after the CBA expired. Additionally, through July of 1984, Mr. Emsing automatically deducted Union dues from employees' paychecks and forwarded them to the Union. Based on this evidence, the Board was justified in concluding that the Union had not abandoned representation of the bargaining unit.[11]

#### 2. Notice of Closing

■ The respondents argue that the Union had adequate notice that Emsing's was

**9.** The ALJ and Board found that it was "unnecessary to decide whether the 23 May [1984] ratification was untimely, or if timely, whether it constituted a renewal of the CBA, as modified, where the fact of the ratification was never communicated to ESI." ALJ Dec. at 13. We agree that this issue need not be addressed.

**10.** In early 1984, without notice to the Union, Mr. Emsing initiated a number of cost-cutting measures. In January Mr. Emsing began reducing Emsing's inventory, changed the mix of products, reduced the variety, and made a move to convert the supermarket into a "convenient market." ALJ Dec. at 7. In February, Mr. Emsing cut the size of the store by building a wall down the center of the store, and laid off four to five Union employees by seniority. In March, without regard to seniority, Mr. Emsing unilaterally reduced all hours for employees by twenty percent. Also in March, Mr. Emsing cut the employees' pay by the previously proposed amount of ten percent. The Union failed to object to these changes and the Union complaint did not allege that these acts violated the collective bargaining agreement. These actions were introduced by the respondents as evidence that, by failing to object to the changes, the Union had abandoned the bargaining unit. Thus Mr. Emsing asserted that he did not believe there was a collective bargaining agreement after October 31, 1983. As noted in the text, although the Board found that all of these changes had been made, it did not find that they were dispositive of the issue of whether or not the Union had abandoned its agreement.

**11.** The respondents argue that the Union's failure to notify ESI of the employees' acceptance of the proposed contract on May 23, 1984 is evidence that the Union abandoned Emsing's bargaining unit. The ALJ found that such "lack of diligence does not rise to the level of abandonment nor does it excuse Respondent's failure to continue the benefit payments." ALJ Dec. at 13. The Board adopted this finding of the ALJ. The question of Union abandonment is within the Board's area of expertise. *See Penntech Papers,* 706 F.2d at 22–23.

going to close thus making possible meaningful bargaining over the effects of the store's closing.[12] Based on the facts in the record, the Board adopted the ALJ's findings that ESI did not give adequate notice to the Union before it closed Emsing's. The applicable standard of review requires that we uphold the Board's decision. There is substantial evidence in the record to find that ESI did not give adequate notice to the Union before it closed and thus precluded meaningful bargaining over the effects of that closing.

We must first determine whether there was substantial evidence for the Board to conclude that the decision to close was made on August 1, 1984. During the hearing before the ALJ, Mr. Emsing testified that the decision to close the store was made "around August first ... of '84." Tr. at 100, 916. Although the Union must have suspected that Emsing's might have to close,[13] the Board found that the actual decision to close the store was not made until August 1, 1984. The respondents argued that "all that occurred on August 1, 1984 was that Alan Emsing admitted to himself that [Emsing's] 'had to close.'" Respondents' Br. at 27. However, the testimony of Mr. Emsing reveals that even he hoped that the drastic cost-cutting measures would save the store. He testified that "sales were dropping, we were losing money on an average of $2,000 a week. We reduced the size of the store, we laid

people off, *doing everything we could to keep that store open." Id.* (emphasis supplied). If Mr. Emsing was hopeful until August 1, 1984 that the supermarket could avoid closing, it was not unreasonable for the Board to conclude that the decision to close was not made until August 1. Therefore, the Board had before it sufficient evidence to conclude that the decision to close was not made until August 1, 1984. *See Universal Camera,* 340 U.S. at 477, 71 S.Ct. at 459.

We now turn to the question of whether adequate notice of this August 1 decision was given to the Union. ESI had a duty to bargain with the Union concerning the "effects" of its decision to close, *First Nat'l Maintenance Corp. v. NLRB,* 452 U.S. 666, 681–82, 101 S.Ct. 2573, 2582–83, 69 L.Ed.2d 318 (1981); *Penntech Papers,* 706 F.2d at 26; *Electrical Prods. Div. of Midland–Ross Corp. v. NLRB,* 617 F.2d 977, 983 (3d Cir.), *cert. denied,* 449 U.S. 871, 101 S.Ct. 210, 66 L.Ed.2d 91 (1980), and this bargaining had to be done "in a meaningful manner and at a meaningful time." *First National,* 452 U.S. at 682, 101 S.Ct. at 2582; *NLRB v. National Car Rental Sys., Inc.,* 672 F.2d 1182, 1189 (3d Cir.1982). The closure cannot be a "fait accompli" which would make good-faith bargaining "futile or impossible." *Penntech Papers,* 706 F.2d at 26; *National Car Rental,* 672 F.2d at 1189. "The determination of whether an

---

**12.** The Board's complaint alleged that, "[s]ince on or about August 9, 1984, Respondent has failed and *refused to negotiate* with the Union with respect to [the effects of the closing on Unit employees]." R. Vol. IV, GC Ex. 1(e) at 6 (emphasis supplied). The ALJ noted that:

> Respondent violated Section 8(a)(1) and (5) of the Act on or about 1 August by *failing to notify* the Union of its decision to close its Griffith store on 11 August 1984. Although the complaint alleges the violation in terms of informing the employees on 1 August and refusing on and after 9 August to negotiate with the union, the nature of the finding I have made was fully litigated.

ALJ Dec. at 14 (emphasis supplied). "It is well settled that ... [the] General Counsel's complaint must give a respondent fair notice of the violations charged...." *NLRB v. Schwab Foods, Inc.,* 858 F.2d 1285, 1294 (7th Cir.1988). Although the Board's complaint did not allege specifically that meaningful bargaining was precluded by inadequate notice, the ALJ deter-

mined that this aspect of the issue was fully litigated. The Board adopted the ALJ's finding that meaningful bargaining over effects of the closing was precluded by ESI's failure to notify the Union of the closing and the parties briefed this question before our court. We shall therefore address the question of whether meaningful bargaining over effects was precluded by ESI's failure to give notice to the Union on August 1 of its intention to close on August 11.

**13.** Rumors were circulating that the store would have to close. The Union also knew that ESI was having financial difficulties because Mr. Emsing told the Union that, without concessions, Emsing's could not stay open. Additionally, in April or May 1984 Mr. Primm went to Emsing's to post a Union notice. At that time Mr. Primm should have seen that Emsing's had reduced both personnel and its selling floor by fifty percent.

employer has provided such meaningful and timely notice is essentially one of fact, and the Board's findings in this regard are to be accepted if supported by substantial evidence." *Penntech*, 706 F.2d at 27.

Mr. Emsing testified that he received a telephone call from Mr. Primm on August 8 or 9, three or four days before the store closed. Mr. Emsing testified that Mr. Primm's reason for calling was that he had heard rumors that the store was going to close and asked Mr. Emsing if these rumors were true. Mr. Emsing told Mr. Primm that the rumors were true and confirmed that the store would be closing. The ALJ and the Board found that, during this telephone conversation, Mr. Emsing said he was willing to discuss the effects of the closing. ALJ Dec. at 14. Upon hearing this, Mr. Primm informed Mr. Emsing that he was busy and that he would have to call back at a later date to set up an appointment.

The respondents allege that the Union waived its right to bargain over effects by sleeping on that right until long after the store had closed and the opportunity for meaningful bargaining had expired. The ALJ found that ESI had the legal duty to notify the Union of its decision to close and that, by failing to contact the Union sooner, ESI had violated this duty. The Board adopted the ALJ's findings that ESI's three or four days' notice was not enough time to allow the Union to engage in meaningful bargaining over the effects of the closing.

There is substantial evidence in the record to support the Board's finding. When the ALJ analyzed this issue, he did not demand an unreasonable amount of advance notice but instead stated that notification to the Union on August 1—the same date that the employees were told of the closing—might have been adequate to avoid committing an unfair labor practice. This notice might have allowed Mr. Primm to carry out his previously scheduled business and still afforded him enough time to bargain with ESI over the effects of the closing. The ALJ noted that "Primm was not required to cancel his other engagements on such short notice and press for a meeting." ALJ Dec. at 14. For these reasons the ALJ found that, by failing to notify the Union on August 1, 1984 that it intended to close the store on August 11, ESI had violated sections 8(a)(1) and (5) of the Act. The Board concurred in the ALJ's evaluation. This is the sort of evaluation that Congress committed to the expertise of the Board and that deserves our deference. *See generally Universal Camera*, 340 U.S. at 488, 71 S.Ct. at 464 (the Board is "equipped or informed by experience to deal with [this] specialized field of knowledge"). We shall not disturb the Board's determination.

Relying on *Yorke v. National Labor Relations Board*, 709 F.2d 1138 (7th Cir. 1983), *cert. denied*, 465 U.S. 1023, 104 S.Ct. 1276, 79 L.Ed.2d 680 (1984), the respondents argue that even if ESI failed to give adequate notice, this failure was excused by the emergency economic conditions in which ESI found itself in August 1984. In *Yorke*, a trustee in bankruptcy was appointed because the former management of a company had grossly mismanaged the company's dwindling assets. The day the trustee was appointed, he visited the company plant, found no employees at work, and learned that this was the result of a lack of funds. The trustee closed the plant the same day without notice to the Union. This court held that "the emergency situation with which [the trustee] was confronted excused his obligation to notify the Union before closure." *Id.* at 1143. Mr. Emsing, by contrast, had been living with a declining financial situation for quite a while. ESI's problems were not the result of an immediate financial emergency but instead were the result of a steady erosion of ESI's financial well-being.

## B. *ESI and RSI Constituted a Single Employer*

We turn now to the Board's determination that ESI and RSI constitute a single employer. The ALJ concluded that ESI and RSI did not constitute a single employer. The Board, using the same analysis, arrived at the opposite conclusion.

### 1. The ALJ Decision

The ALJ cited the four factors that must be considered in a determination of single employer status: 1) interrelation of operations, 2) common management, 3) centralized control of labor relations, and 4) common ownership. *Radio & Television Broadcast Technicians, Local 1264 v. Broadcast Serv. of Mobile, Inc.*, 380 U.S. 255, 256, 85 S.Ct. 876, 877, 13 L.Ed.2d 789 (1965) (per curiam). The ALJ noted his belief that "the Board has stressed the first three factors, particularly centralized control of labor relations." ALJ Dec. at 15 (citing *FEDCO Freightlines, Inc.*, 273 N.L.R.B. 399 (1984), and *Truck & Dock Services, Inc.*, 272 N.L.R.B. 592 (1984)).[14]

The last three factors were resolved rather easily by the ALJ. With respect to the second factor, the ALJ found that ESI and RSI had identical management. The ALJ noted that Mr. and Mrs. Emsing made all the important management decisions for both ESI and RSI including determining pricing, product mix, work schedules, hiring, firing, and selecting vendors. Additionally, the only person outside the family who carried any managerial title was Dave Davis who was secretary-treasurer of RSI and designated store manager of Rocky's. Davis was secretary-treasurer of RSI in name only and served in that capacity merely as a convenience for store operations. Under the third factor, the ALJ found, for many of the same reasons that were relevant to the second factor, that at all relevant times the labor relations policies of ESI and RSI were under the centralized control of Mr. and Mrs. Emsing. Mr. Emsing testified that he and his wife jointly established the labor relations policies for ESI and the ALJ found this to be adequate to make his finding. As to the fourth factor, the ALJ found that there was substantially identical ownership despite the retention of some treasury shares of ESI by Mr. Emsing's father as a securi-ty for the purchase price of the corporation.

The critical factor for the ALJ was the first factor—the interrelation of operations. The ALJ found that "Emsing's and Rocky's were not directly integrated by serving a common production or sales goal such as where one firm exists to supply a sister firm with the personnel or equipment the other needs to accomplish the overall corporate goal as in *Consolidated Dress Carriers*, 259 NLRB 627 (1981) and *Malcolm Boring Co.*, 259 NLRB 597 (1981)." ALJ Dec. at 17. The ALJ believed that the proper focus for the inquiry should be the day-to-day operations when both Emsing's and Rocky's were open and operating and not what happened in August when Emsing's was closing.

### 2. The Board Decision

The Board disagreed with the ALJ's conclusion that RSI and ESI did not constitute a single employer. The Board relied on the same four criteria and concluded that the two entities did constitute a single employer. The Board noted that none of the factors alone is controlling and clarified that "the fundamental inquiry is whether there exists overall control of the critical matters at the policy level." *Emsing's Supermarket, Inc.*, 284 N.L.R.B. No. 41 (June 18, 1987) [hereinafter Board Dec.]; *see Penntech Papers*, 706 F.2d at 25.

The Board agreed with three of the ALJ's conclusions: that common ownership was undisputed; that Mr. and Mrs. Emsing made all of the management decisions; and that they jointly established the labor relations policies for both stores. The point of departure for the Board was the first factor—interrelation of operations. The Board explained that the ALJ erroneously had considered this first factor dispositive, rather than simply one of four factors to guide the overall inquiry. The Board also believed that the ALJ had erred in his conclusion that functional integration did

---

**14.** The General Counsel did not allege that RSI was a participant in the unfair labor practices or that RSI has inherited any of ESI's bargaining obligations with the Union. RSI is only liable through derivative liability if RSI and ESI are found to be a single employer. Since ESI is no longer in business, this determination is crucial, as a practical matter, in the imposition of any monetary remedy.

not exist. In the Board's view, events before *and after* Emsing's closing were relevant to the determination of ESI's and RSI's single-employer status. The Board emphasized that the single-employer relationship is characterized by the absence of an arm's length relationship. Board Dec. at 6. The Board interpreted the actions of the employers as, in effect, using "Rocky's as a captive customer to purchase Emsing's leftover inventory and essentially worthless equipment which would have otherwise remained unliquidated and at risk of seizure." Board Dec. at 7. The Board also noted that funds from RSI had been transferred to ESI to shore up ESI's financial situation. ESI's final payroll was met with RSI funds. A single health insurance policy covered the employees of both stores. The Board also found relevant that Rocky's issued a check to cover a check of Emsing's that had been returned for insufficient funds; and that Mr. and Mrs. Emsing transferred a car, to which Emsing's held title, to Rocky's.

### 3. Analysis

■ "The Board's conclusion that nominally separate corporations constitute a 'single employer' is essentially a factual one and 'not to be disturbed provided substantial evidence in the record supports the Board's findings.'" *Penntech Papers*, 706 F.2d at 24–25 (quoting *NLRB v. Pizza Pizzaz, Inc.*, 646 F.2d 706, 708 (1st Cir.1981)); *see also NLRB v. C.K. Smith & Co.*, 569 F.2d 162, 164 (1st Cir.1977), *cert. denied*, 436 U.S. 957, 98 S.Ct. 3070, 57 L.Ed.2d 1122 (1978). There is substantial evidence in the record to support the Board's ultimate finding that ESI and RSI constituted a single employer. The Board's findings that there was common ownership, common management, and centralized control of labor relations are clearly supported by substantial evidence on the record as a whole. Mr. and Mrs. Emsing owned all of the stock of both RSI and ESI with the exception of some treasury shares in ESI that Alan's father retained when he sold Mr. Emsing the company. Additionally, it is clear that Mr. and Mrs. Emsing were the sole managers of the two stores. The hiring and firing of employees also clearly fell on Mr. and Mrs. Emsing. Finally, with respect to integration of operations, we must accord great deference to the Board's view that, in order to effectuate the purposes of the Act, events both before and after the closing of Emsing's must be considered. When considering events that occurred *both* before and after the closing, we must conclude that the Board's decision that ESI and RSI constitute a single employer is supported by substantial evidence on the record as a whole.

### C. *The* Transmarine *Remedy*

■ Without conceding the merits of the case, the respondents also submit that the Board exceeded its authority in imposing the so-called *Transmarine* remedy in this case. In *National Labor Relations Board v. Transmarine Navigation Corp.*, 380 F.2d 933 (9th Cir.1967), the Ninth Circuit was asked to enforce a Board order. The Board had found, pursuant to the decision of an ALJ, that the decision to close Transmarine Navigation Corporation's (Transmarine) shipping operation and its reinvestment of that capital into a joint venture (in a different location) was a subject of mandatory bargaining. As a remedy for this unfair labor practice, Transmarine was ordered to pay its displaced personnel the "loss of wages they may have suffered between the closing of the [business] and ... when [Transmarine] offered to bargain with respect to any matter in dispute." *Transmarine Navigation Corp.*, 152 N.L.R.B. 998, 1006 (1965). On Petition for Enforcement of the Order, the Ninth Circuit found that the decision to close was not a mandatory subject of bargaining and consequently found an unfair labor practice only with respect to the failure to bargain over "effects." 380 F.2d at 939. Because the court had found a different kind of unfair labor practice, the Ninth Circuit remanded the case to the Board to allow it to review its ordered remedy in light of the new decision. On remand, the Board found that, "[u]nder the circumstances of [the] case, including the lapse of time and changes in the corporate nature of [Trans-

marine], it is impossible to reestablish a situation equivalent to that which would have prevailed had [Transmarine] more timely fulfilled its statutory bargaining obligation." *Transmarine Navigation Corp.*, 170 N.L.R.B. 389, 389 (1968). The Board found that the lapse of time would make a bargaining order, without more, an inadequate remedy. It was necessary for the Board to create conditions essentially similar to those that would have existed had Transmarine bargained at the time required by the Act.

The *Transmarine* Board entered the following order,

[I]n order to assure meaningful bargaining and to effectuate the purposes of the Act, we shall accompany our order to bargain over the effects of the shutdown with a limited backpay requirement designed both to make whole the employees for losses suffered as a result of the violation and to recreate in some practicable manner a situation in which parties' bargaining position is not entirely devoid of economic consequences for [the company]. We shall do so in this case by requiring [the company] to pay backpay ... [and] require the amounts to be paid to be not less than the amounts the [employees] would have earned during a 2-week period of employment.

Accordingly, we shall order the [company] to bargain with the Union, upon request, about the effects on [its employees] of the ... shutdown, and to pay these employees amounts at the rate of their normal wages when last in the [company's] employ from 5 days after the date of this Supplemental Decision until the occurrence of the earliest of the following conditions: (1) the date the [company] bargains for agreement with the Union on those subjects pertaining to the effects of the closing on the [employees]; (2) a bona fide impasse in bargaining; (3) the failure of the Union to request bargaining within 5 days of this Supplemental Decision, or to commence negotiations within 5 days of the [company's] notice of its desire to bargain with the Union; or (4) the subsequent failure of the Union to bargain in good faith;

but in no event shall the sum paid to any of these employees exceed the amount he would have earned as wages [from the date of closing] to the time he secured equivalent employment elsewhere, or ... the date when the [company] offered to bargain, whichever occurred sooner; provided, however, that in no event shall this sum be less than these employees would have earned for a 2-week period at the rate of their normal wages when last in the [company's] employ.

*Transmarine*, 170 N.L.R.B. at 390. In this case, the Board entered a similar order:

ESI shall pay the unit employees on the payroll as of 1 August 1984 amounts at the rate of their normal wages when last in ESI's employ from 5 days after the date of the Board's order until the occurrence of the earliest of the following conditions:

(1) the date ESI bargains for agreement with the Union on those subjects pertaining to the effects of closing on the unit employees;

(2) a bona fide impasse in bargaining;

(3) the failure of the Union to request bargaining within 5 days of the Board's order, or to commence bargaining within 5 days of ESI's notice of its willingness to bargain with the Union; or

(4) the subsequent failure of the Union to bargain in good faith.

The sum paid to any of these employees shall not exceed the amount he would have earned as wages from 11 August 1984, the date Emsing's Supermarket closed, to the time he secured equivalent employment elsewhere, or the date on which ESI offers to bargain, whichever occurs sooner; provided, however, that in no event shall this sum be less than the employees would have earned for a 2-week period at the rate of their normal wages when last in ESI's employ....

ALJ Dec. at 21–22 (footnotes omitted).

In reviewing the legal propriety of this order, we begin with the fundamental proposition that, in fashioning remedies for violations of the Act, "the Board draws on a

fund of knowledge and expertise all its own, and its choice of remedy must therefore be given special respect by the reviewing courts." *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 612, 89 S.Ct. 1918, 1939, 23 L.Ed.2d 547 (1969). At the same time, we have noted that, "while the Board is given wide leeway in fashioning remedies, the remedy chosen must 'achieve the remedial objectives which the Act sets forth.'" *Yorke*, 709 F.2d at 1144–45 (quoting *Republic Steel Corp. v. NLRB*, 311 U.S. 7, 9–11, 61 S.Ct. 77, 78–79, 85 L.Ed. 6 (1940)). The remedy "must not punish the employer for its violations." *Yorke*, 709 F.2d at 1145. The *Transmarine* remedy was not designed as a punitive measure by the Board.

> The object of such a remedy is twofold. First, the remedy does seek to make employees whole for their losses to limited degree [sic]. Secondly, and more importantly, *Transmarine* and other similar 8(a)(5) remedies are designed to restore at least some economic inducement for an employer to bargain as the law requires.

*O.L. Willis, Inc.*, 278 N.L.R.B. 203, 205 (1986); *see also Kirkwood Fabricators, Inc., v. NLRB*, 862 F.2d 1303, 1307 (8th Cir.1988) (limited backpay remedy "may be set aside only upon a showing of abuse of [the Board's] broad discretion in its field of specialization"). We have recognized that "[e]nsuring meaningful bargaining comports with the primary objective of the Act." *Yorke*, 709 F.2d at 1145. On the other hand, we have also refused to permit the Board to calculate the backpay remedy from the date of the Board's decision when

the case raised a novel issue of law and the employer resisted enforcement as the only legitimate way to obtain a definitive ruling on the question. *See id.* at 1146.

In this case, we believe that the Board acted within the bounds of its statutory discretion in imposing the *Transmarine* remedy as part of its order. While this case involves relatively close factual questions, and required the Board to employ its expertise in evaluation of the factual setting, it does not present any novel question of law. As we have noted earlier, the duty to bargain with respect to the effects of a closing is well settled. *See First National*, 452 U.S. at 681–82, 101 S.Ct. at 2582–83. It is also well settled that an employer may not make unilateral changes in the terms of the bargaining agreement while renewal negotiations are still in progress. *See NLRB v. Harvstone Mfg. Corp.*, 785 F.2d 570, 581 n. 12 (7th Cir.), *cert. denied*, 479 U.S. 821, 107 S.Ct. 88, 93 L.Ed.2d 41 (1986). Therefore, the exception applicable in *Yorke* is not available to the respondents in this case.

## CONCLUSION

The order of the Board, both with respect to the violations of the Act and with respect to the appropriate remedy, is supported by substantial evidence in the record. The remedy is sufficiently tailored to promote the primary objectives of the Act. Accordingly, the order of the Board is enforced.[15]

ENFORCEMENT GRANTED.

---

**15.** On October 24, 1984, we issued an Order directing the parties to file supplemental briefs addressing the question of the relevance of the *Transmarine* remedy to the facts in this case. In their brief, the respondents requested that the enforcement of the Board's Order be denied or, in the alternative, that the Board's Order be clarified as to the imposition of the seemingly inconsistent affirmative obligations to *"bargain* collectively concerning certain payments and to *make* certain payments to employee benefit funds and for vacations." Respondents' Supplemental Br. at 9 (emphasis supplied). The respondents requested either that we clarify the order or that we remand the provisions to the Board for consideration and clarification. *Id.*

Such action is, however, unnecessary. The Board's position on this question was made clear at oral argument. Counsel for the NLRB, when questioned by the court about the seeming inconsistency, stated that the Board has determined that the respondents must make the delinquent payments in question. The Board, however, does not know the amounts of the payments that must be made. Thus, the bargaining that the Board has ordered is directed at determining both the amounts due and the effects of the closing on the Emsing's employees. Because this information adequately clarifies the language of the Order, we enforce the Order as issued.

KANNE, Circuit Judge, concurring in part and dissenting in part.

I agree with the majority that ESI violated the NLRA. However, I do not agree that substantial evidence supports the Board's decision that ESI and RSI constitute a "single employer" for remedial purposes. I think that the ALJ correctly concluded that the two entities were not "functionally integrated." Consequently, I would enforce the order to the extent that it demanded ESI to provide specified remedies and would release RSI from any liability for ESI's NLRA violations.